**Ardith McPHERSON,**
**Plaintiff-Appellant,**

v.

**Walter RANKIN, Individually and in his Official Capacity as Constable, Precinct One of Harris County, Texas, and Harris County, Texas, Defendants-Appellees.**

No. 85–2129.

United States Court of Appeals,
Fifth Circuit.

March 19, 1986.

Bruce Griffiths, Greater Houston Civil Liberties Union, Houston, Tex., Annie S. Garcy, Bellaire, Tex., for plaintiff-appellant.

Billy E. Lee, Asst. Co. Atty., Mile Driscoll, Houston, Tex., for defendants-appellees.

Before WILLIAMS, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

On March 30, 1981, President Reagan was shot. After hearing a radio report of the attempted assassination, Ardith McPherson, a clerical worker in a Houston, Texas constable's office, said to a co-worker: "[I]f they go for him again, I hope they get him." A deputy constable overheard the statement and reported it to Constable Rankin, who immediately summoned McPherson to his office to question her about the remark. When McPherson acknowledged both that she had made the statement and that she meant it, Rankin fired her.

I

McPherson sued Rankin and Harris County under 42 U.S.C. § 1983. After the district court granted defendants' motion for summary judgment, a panel of this court remanded for a trial on the merits. Noting McPherson's contention that "her statement was merely a form of political hyperbole and was not intended to advocate harm to the President," *McPherson v. Rankin,* 736 F.2d 175, 178 (5th Cir.1984),

the panel observed that "[t]he issue of McPherson's intent is relevant to the present inquiry because it is imperative that a court's characterization of speech as political expression, for purposes of First Amendment protection, be predicated upon consideration of its 'content, form, and context,'" *id.* at 178–79 (citation and footnote omitted).

After the ordered trial, the district judge ruled from the bench, explaining:

> I'm not sure that the real question in this case is what she meant. . . . I suppose . . . that [this] is certainly private speech . . . I don't believe she meant nothing, as she said here today, and I don't believe that those words were mere political hyperbole. They were something more than political hyperbole. They expressed such dislike of a high public government official as to be violent words, in context. This is not the situation where one makes an idle threat to kill someone for not picking them up on time, or not picking up their clothes. It was more than that.

The court also found that Rankin had a need for employees who will not "mistreat the public, disappoint the public, [or] insult the public," and concluded by purporting to balance McPherson's speech-related interests against the interests of the constable's office in law enforcement. In holding that McPherson's remark was not protected speech, the court seems to have concluded both that McPherson actually hoped that the President would be killed and that Rankin could fire her for that view. In Constable Rankin's colorful words, he ought not be required to employ a person who "rides with the cops and cheers for the robbers."

## II

McPherson argues that the district court erred as a matter of law in not recognizing the political character of her speech and in concluding that it was not within the protective ambit of the first amendment. She also urges that the interests of her employer do not outweigh her rights of free speech. Defendants reply that McPherson

espoused "a violation of the criminal law of murder . . . completely inconsistent with the oath to uphold the laws to which both the Constable and the Deputy have been sworn [and that it] is not only the right of the Constable but also his duty to terminate a Deputy's appointment when that Deputy apparently desires to see the criminal laws violated."

## III

### –1–

Hornbook law informs us that the first amendment, as applied to the states, *Wallace v. Jaffree,* — U.S. —, 105 S.Ct. 2479, 2486, 86 L.Ed.2d 29 (1985), protects a very wide range of speech from suppression by the government. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Although not all spoken words are covered by the first amendment, *Konigsberg v. State Bar,* 366 U.S. 36, 49 n. 10, 81 S.Ct. 997, 1006 n. 10, 6 L.Ed.2d 105 (1961), constitutional protection extends to expression concerned with private matters, *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), as well as to speech that takes place in private, *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). A state would therefore face considerable constitutional obstacles if it sought to criminalize the words that were uttered by McPherson on the day the President was shot.

The government has not sought to prosecute McPherson as a criminal, but to terminate her from a public job, which presents a very different set of legal questions. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Only when a government employee engages in expression addressed to "matters of public concern" does the first amendment protect him from termination for such expression: "ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to

judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Connick*, 103 S.Ct. at 1690 (citations omitted). This rule is based on "the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* at 1688 (footnote omitted). If it is established that the speech in question is addressed to "matters of public concern," we are required to balance the first amendment interest in protecting the employee's freedom of expression against the government's interest in maintaining discipline and efficiency in the workplace. *Id.* at 1686. In striking this balance, we must give *"full* consideration [to] the government's interest in the effective and efficient fulfillment of its responsibilities to the public," *id.* at 1692 (emphasis added), and we must *not* demand that the government employer "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," *id.* (footnote omitted).

With these well-worn principles in mind, we must first decide whether McPherson was fired for her expressed views on a matter of public concern. She has maintained throughout this litigation that her statement was meant as a criticism of the President's social and economic policies, and no one has contended that she could constitutionally be fired merely for criticizing those policies. A difficulty arises, however, because she chose such a repulsive, nigh obscene, manner of making her criticism. Had she been fired solely for the disgusting manner of her expression, the first amendment would arguably pose no barrier to Constable Rankin's employment decision. We doubt that public employees could wrap the protective mantle of the first amendment around a string of gutter words simply by appending a remark to the effect that those words describe some public figure or policy.

However, McPherson was undoubtedly fired because of the *content* of her speech. The district court judge found that McPherson's comment was "something *more"* than political hyperbole and he was apparently persuaded that she was fired because she honestly hoped that any future assassination attempt would be successful. Whatever her subjective intent, that is what she said and it is quite plausible that Rankin was telling the truth when he said that that is why he fired her.[1] Because the life and death of the President are obviously matters of public concern, we are therefore required to engage in *Pickering/Connick* balancing and to decide whether society's interest in protecting McPherson's freedom of speech is outweighed by the constable's interest in having employees who do not favor political assassination.

–2–

Constable Rankin is elected to a four-year term on a partisan ballot from Precinct One in Harris County, Texas. This precinct, with approximately three hundred fifty thousand residents, encompasses downtown Houston and a portion of its suburbs. It is wholly *within the police* jurisdiction exercised by the City of Houston and nearby suburban municipalities. The constable's office, which had eighty-odd employees in 1981, has no direct law enforcement role, and none of its deputies are "on the street." Its primary mission is the service of process and execution of warrants issued by courts whose criminal jurisdiction is limited to Class C misdemeanors, which carry a maximum fine of two hundred dollars. Approximately eighty percent of the office's work involves the service of civil process, mental health warrants, and bringing juveniles to the courts. Though Rankin hinted that his office might somehow participate in providing security during presidential visits to Houston, he never explained how this might be, and the district judge did not regard it as a serious suggestion.

---

1. Were there a substantial contention that McPherson was actually terminated for expressing disapproval of the President's policies, we would be faced immediately with the standard-of-review problems discussed *infra* Section III.3.

All employees in the office are officially referred to as "deputy constables," but only those who are commissioned peace officers may carry firearms, serve process, or execute warrants. To become a commissioned peace officer, one must undergo a background check, a psychological exam, and over 300 hours of training. McPherson, who received only two days of computer instruction when hired, was not a commissioned peace officer. She played an entirely clerical role within the office: seated at a desk with no phone, in a room of computer terminals closed to the public, her duty was to enter data from court papers into a computer's memory by typing at a conventional CRT.

McPherson testified without contradiction that her statement about the attempted assassination was made at the end of a discussion about the President's policies with a co-worker, Lawrence Jackson, whose duties were identical to hers. At trial, Jackson corroborated McPherson's testimony and explained that he understood her remark as merely "a response and an expression." He was not cross-examined. McPherson testified that Constable Rankin did not allow her to explain the context of the overheard remark; Jackson, the witness to its context, was not consulted. Indeed, Rankin does not deny that the remark was part of a discussion between two employees about their opinions of the President's policies; he testified that because McPherson conceded that she "meant" the remark, he felt no duty to inquire further.

–3–

For the purpose of applying the *Pickering/Connick* balancing test, we accept the district court's conclusion that McPherson actually hoped that the President would be assassinated. The precise fit of the clearly erroneous standard of review and our duty to make "an independent constitutional judgment on the facts of the case," *Connick*, 103 S.Ct. at 1692 n. 10 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (opinion of Brennan, J.)), is not altogether clear. We are enjoined to "determine the meaning and application of those words of [the Constitution] which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they were made to see whether or not they ... are of a character which the principles of the First Amendment ... protect." *Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) (footnote omitted). The task of simultaneously applying both independent and deferential standards of review is of course more difficult at their juncture than at their distant edges. *See generally Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). For example, when what was said and its context are undisputed, the constitutional "status" of the speech is to be independently examined by an appellate court. When what was said, but not its context, is disputed, the choice belongs to the trier of fact; on appeal, the determination of what was said is subject to review by the clearly erroneous standard, and the constitutional "status" of the statement is given independent review. Yet, when a factual dispute centers not on what was said but on its context, the deference due a trial court's findings becomes less certain: factual conclusions about the speaker's intent, audience effect, and other elements of context are not so easily disentangled from a decision as to whether a statement was "political" or directed at "public concerns."

With this caution in mind, we find that the record supports the district court's conclusion that McPherson expressed an actual wish for the assassination of the President. It is true that she has at every stage of this litigation denied that this was her view or the purpose of her statement, and she is supported by the only person who heard the remark in context. McPherson's subjective intent, however, was an historical fact, and her statement to Rankin that she "meant" what she said provides the requisite support for the district court's "factual" finding, which may have been based in part on the demeanor of the wit-

nesses. The question is close, resting ultimately on an inference drawn from the inevitably ambiguous response to the question, "Did you mean it?" That inference is a slender but adequate reed: we are not left with the firm belief that a mistake was made in this finding of fact by the district court.

■ Regardless of her intent, however, McPherson's comment clearly addressed a matter of public concern. Whether her statement was an hyperbolic expression of unhappiness with the President's policies, or an actual wish for his assassination, it was evoked by and addressed to serious matters of public concern. Thus, the value of protecting her right to express her opinion, however loathsome, must be weighed against the competing interests of the constable's office in the effective and efficient fulfillment of its law enforcement responsibilities.

-4-

We are persuaded that the government's interest in maintaining an efficient office does not outweigh the first amendment interest in protecting McPherson's freedom of expression. Her comment was made to a co-worker who, with the benefit of the remark's full context, was not offended. Constable Rankin specifically denied having fired her because of any disruption caused by her comment, and the evidence did not show that the remark threatened the future efficiency or morale of the office.

■ The government's strongest argument lies in Constable Rankin's contention that he should not have to employ *anyone* who "rides with the cops and cheers for the robbers." We understand this to mean that a government agency is entitled to employ only those individuals who have no serious reservations about the fundamental mission of the agency. Just as a hospital has a legitimate interest in ensuring that its employees are not committed to euthanasia, so a law enforcement agency cannot be expected to carry out its mission through officers who favor political assassination. We therefore agree that Constable Rankin's action in dismissing McPherson was based on an important and legitimate government interest.[2]

**2.** The government's interest in requiring that employees be loyal to the mission of the agency for which they work is somewhat different from the government's interest in limiting employees' criticism of their supervisors. The distinction can be illustrated by comparing this case with *Yoggerst v. Hedges,* 739 F.2d 293 (7th Cir.1984). In *Yoggerst,* an employee of a state agency, after seeing newspaper reports that the agency's director had been fired, asked a co-worker, "Did you hear the good news?" After being disciplined for this remark, the employee resigned and brought suit pursuant to 42 U.S.C. § 1983. The Seventh Circuit held that the remark was not speech on a "matter of public concern" under *Connick:* "It is clear from the content of Yoggerst's statement that she was speaking *in her role as an employee* about her personal feelings and not in her role as a citizen on a matter of public concern.... The content of Yoggerst's speech was clearly about her relationship with the Director, a matter of no public concern; the fact that she spoke at a time when the Director's continued tenure in office was a matter of public interest does not alter this characterization." 739 F.2d at 296 (emphasis added) (citation omitted). Thus, the result in *Yoggerst* was dictated by the central principle enunciated in *Connick:* the Constitution "does

not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.... [T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over *internal office affairs.*" *Connick,* 103 S.Ct. at 1690, 1691 (emphasis added).

Unlike Yoggerst's comment, Ardith McPherson's remark had no direct bearing on internal office affairs and was made in her role as citizen rather than in her role as a public employee: her assassination remark was made in the context of a discussion of Reagan administration policies. This distinction may strike some as unduly artificial, for it is true that an acceptance of political assassination, like acceptance of the illegal overthrow of the government, reflects a generalized disloyalty to the very principles on which our public institutions operate. Any government official would properly be quite distressed to find his subordinates expressing such disloyalty, and we acknowledge that there are arguments for the proposition that the first and fourteenth amendments, properly interpreted, do not require government agencies to employ persons who are opposed to the fundamental principles on which our government is based. The Supreme Court, however, has rejected these arguments and foreclosed our

The difficulty with the government's position in this case, however, is that McPherson's duties were so utterly ministerial and her potential for undermining the office's mission so trivial. McPherson was one of about a dozen clerk-typists working in a closed room. She was not a law enforcement officer and she had none of the discretion or power associated with that position. Her job did not bring her into contact with the public, and the district court was not persuaded that she had any access to sensitive or important files. Were any of these factors different, we would have a different case. But in these distinct circumstances, we cannot say that McPherson could constitutionally be fired for her expression of political opinion. Absent evidence that a government employee's views are inconsistent with the mission of the employing agency *and* with the employee's role in that agency, tolerance is required.

A large body of first amendment jurisprudence is built on the proposition that political liberty will best be secured in the long haul if the government tolerates as much diversity of opinion as its responsibilities will allow. Our first amendment jurisprudence is a boast that in a free society foolish ideas will fall of their own weight. The ideal of tolerance is sometimes sorely taxed in practice—when that happens, there is all the more reason to recall its long-term benefits. However ill-considered Ardith McPherson's opinion was, it did not make her unfit for her lowly job in Constable Rankin's office.

REVERSED and REMANDED for determination of an appropriate remedy.

consideration of them. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (state may not constitutionally bar employment as public school teachers to persons who knowingly belong to organizations seeking the unlawful overthrow of the government); *Connick,* 103 S.Ct. at 1688–89 (reviewing related cases and reaffirming *Keyishian* ).