**Salvatore ZICCARELLI, Plaintiff,**

v.

**Spencer LEAKE, individually and in his official capacity as Executive Director of the Cook County Department of Corrections, Defendant.**

**No. 90 C 444.**

United States District Court,
N.D. Illinois, E.D.

July 12, 1991.

---

Kenneth Flaxman, Chicago, Ill., for plaintiff Salvatore Ziccarelli.

Jack O'Malley, State's Atty. of Cook County, Susan C. Salita, Asst. State's Atty., Chicago, Ill., for defendant Spencer Leake.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Salvatore Ziccarelli ("Ziccarelli") was fired from his position as a prison guard because he testified on behalf of the defense at an Illinois death penalty hearing. Ziccarelli filed this civil rights lawsuit claiming he was fired because he exercised his first amendment right to testify at trial. Both parties move for summary judgment, and Ziccarelli moves for injunctive relief and an expedited trial. For the reasons set forth below, we grant summary judgment in favor of Ziccarelli.

## FACTS

Ziccarelli began work as a correctional officer at the Cook County Department of Corrections ("Department") on September 1, 1989. By statute, new correctional officers hold their positions on a probationary basis for the first twelve months of their appointment. Ill.Rev.Stat. ch. 34 ¶ 3–7008. During this time, the employees can be discharged at the will of the Cook County Sheriff. *Id.*

The controversy in this case concerns the Department's unwritten policy regarding correctional officers testifying about matters related to their job. While the parameters of this policy are vague, the Department's policy prohibits its officers from testifying about any matters related to their job without first having been served with a subpoena that had been evaluated either by Robert E. Golty ("Golty"), assistant director of the Department, or Spencer Leake ("Leake"), the executive director of the Department. The Department claims this policy is needed to ensure the safety of correctional officers who guard inmates and to ensure correctional officers are not indiscriminately making court appearances to testify about their jobs.[1]

On November 2, 1989, while off-duty, Ziccarelli testified voluntarily on behalf of the defense at a death penalty hearing in *People v. Jacobson*, 88 CR 7780, a criminal case pending in the Circuit Court of Cook County.[2] Ziccarelli was acquainted with the defendant and provided character testimony on his behalf. Upon learning of Ziccarelli's appearance at the death penalty hearing, the Department terminated Ziccarelli for testifying without first having been subpoenaed.

On January 25, 1990, Ziccarelli filed a two-count complaint pursuant to 42 U.S.C. § 1983 against Leake individually and in his official capacity. Both parties moved for summary judgment. For the reasons set forth below, we find that Ziccarelli's termination was in violation of his first amendment rights and grant Ziccarelli's motion for summary judgment.[3]

1. Other reasons for the policy include the following:

    1) to ensure subpoenas are properly served;
    2) to ensure the appropriate person responds to the subpoena; and
    3) to ensure correct documents are produced. (Leake's memorandum in support of his cross-motion for summary judgment at page 10.) These reasons have no applicability to our case since it is uncontroverted that Ziccarelli was never subpoenaed.

2. In Illinois criminal cases where the defendant may be eligible for the death penalty, Illinois criminal procedure requires a separate sentencing hearing ("death penalty hearing") for a jury

to consider whether aggravating factors exist for imposition of the death penalty. Ill.Rev.Stat. ch. 38 ¶ 9–1(d).

3. In its motion, the Department correctly notes that Ziccarelli has failed to allege that the Department's action was taken pursuant to an official Department policy. Such an allegation is necessary to allege a § 1983 action against a government official in his official capacity. *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). While we could grant the Department's motion on this basis, we would only do so without prejudice so that Ziccarelli could amend his complaint to allege the Department's

## DISCUSSION

Summary judgment is appropriate if "the pleadings, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed. R.Civ.P. ("Rule") 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a court must view the record and all inferences to be drawn from it in the light most favorable to the nonmovant. *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991).

There is no issue of fact regarding the circumstances of Ziccarelli's termination; the Department admits that Ziccarelli was terminated because he violated the Department policy prohibiting an employee from testifying about matters related to the Department without first having been subpoenaed. Defendant's memorandum in support of cross-motion for summary judgment and in Opposition to Plaintiff's Motion for Summary Judgment at pages 1 & 3. This matter is appropriate for summary judgment because the only issue before us is the application of the relevant law to these facts.

■ Initially, we note that Ziccarelli has few legitimate challenges to his discharge because at-will public employees can be discharged for any reason, or for no reason at all. *Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Tolmie v. United Parcel Service, Inc.*, 930 F.2d 579, 580 (7th Cir.1991); *Duldulao v. St. Mary of Nazareth Hosp. Center*, 115 Ill.2d 482, 489, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). However, Ziccarelli is entitled to reinstatement if he was discharged on a basis that infringes his constitutionally protected freedom of expression. *Rankin*, 483 U.S. at 383–84, 107 S.Ct. at 2896. Thus, the question of law which we must decide is whether Ziccarelli's first amendment rights were violated because he was discharged for testifying at the death penalty hearing.

■ Whether Ziccarelli's first amendment rights were violated is determined by the balancing test developed in *Pickering v. Board of Education* and its progeny. That test requires us to balance the interests of the employee as a citizen, in commenting upon matters of public concern, against the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and *Mt. Healthy City School Dist. Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) refine the *Pickering* test. Our collective reading of these cases indicates we must conduct a four-part inquiry to determine whether Ziccarelli has a valid first amendment claim.

■ First, we must decide the threshold question of whether the expression touches upon a matter of public concern. *Connick*, 461 U.S. at 141–49, 103 S.Ct. at 1686–91. Second, if the expression satisfies the public concern test, we must balance the interests of the employee in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691; *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. Third, the plaintiff must show that the speech was the motivating factor in the employment decision. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. Finally, if the plaintiff makes the above showing, the burden shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity. *Id.* The first two parts of our inquiry, into the protected status of the speech, is one of law for the court to decide. *Connick*, 461

acknowledged policy. Since the Department has already admitted that Ziccarelli was discharged pursuant to the official Department policy, we will not put the parties to that waste of effort and instead construe Count I as being amended to allege the Department's policy in order to satisfy the *Monell* pleading requirement.

U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Griffin*, 929 F.2d at 1212. The final two steps involve questions of fact for the jury. *Melton v. Oklahoma City*, 879 F.2d 706, 713 (10th Cir.1989).

Leake does not contest that Ziccarelli's expression was the motivating factor in the Department's decision to discharge him or that the Department would not have reached the same decision in the absence of the protected activity. We therefore do not need to discuss the two-part *Mt. Healthy* analysis and only need to determine whether Ziccarelli's speech is protected under the first amendment.

### A. *Public Concern*

■ Whether a public employee's speech touches matters of public concern must be determined by the content, context, and form of the given statement as revealed by the whole record. *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690; *Griffin*, 929 F.2d at 1214.

### 1. Content and Context

The content and context factors focus on the use of the expression. If that use does not relate to any matter of political, social, or community concern, then the *Pickering* test favors the government. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689 (government officials should enjoy wide latitude in man-

aging their offices without intrusive oversight by the judiciary in the name of the first amendment).

■ The content of Ziccarelli's speech was character testimony on behalf of Jacobson. The context of Ziccarelli's speech was testimony offered at Jacobson's death penalty hearing to convince the jury not to impose the death penalty. Without doubt, we find the content and context of Ziccarelli's speech is a matter of political, social, and community concern. To support that conclusion, we could take judicial notice that testimony at a death penalty hearing is a matter of political, social and community concern; other courts have taken judicial notice of similar life and death issues. *McPherson v. Rankin*, 786 F.2d 1233, 1236 (5th Cir.1986), *aff'd*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).[4]

In the alternative, support for our conclusion is found in the historical record. A contentious political and social debate has long surrounded the ultimate penalty. *See e.g.,* D. Hook & L. Kahn, *Death in the Balance*, Lexington Books (1989). And this debate continues today, being maintained by groups who support and oppose the death penalty, some of whom maintain all-night vigils at every state-sanctioned execution.[5]

---

**4.** In *McPherson*, a public employee was discharged for a comment she made, after hearing a radio report that President Reagan was shot, that "if they go for him again, I hope they get him." *McPherson*, 786 F.2d at 1234. In discussing the public concern prong of the *Connick* test, the Fifth Circuit took judicial notice that "the life and death of the President are obviously matters of public concern...." *McPherson*, 786 F.2d at 1234. We do the same here and find that the death penalty, and the fact finding process surrounding the decision to impose the death penalty, are matters of public concern.

**5.** A partial list of those organizations devoted to advocating a position against the death penalty, or to providing information about the death penalty, can be found in the National Coalition to Abolish the Death Penalty, *The 1991 Abolitionist's Directory* (1991). The Abolitionist's Directory lists the following national and religious organizations: National Execution Alert Network, National .Lawyers Guild, National Legal Aid and Defender Association, National Urban League, National Alliance Against Racist and Political Repression, Offender Aid and Restora-

tion, Partisan Defense Committee, Project Hope to Abolish the Death Penalty, SOLACE, Victims' Families For Reconciliation, American Baptist Churches National Ministries, American Friends Service Comm., Christian Church (Disciples), Church of the Brethren, Episcopal Church Office of Social Welfare, Jewish Peace Fellowship, Mennonite Central Committee Office of Criminal Justice, National Council on Islamic Affairs, National Interreligious Task Force on CJ, Pax Christi USA, Presbyterian Church (USA), Social Justice and Peacemaking/Criminal Justice Program, Southern Christian Leadership Conference, Synagogue Council of America, Union of Am. Hebrew Congregation Commission on Social Action, Unitarian Universalist Service Committee, United Church of Christ, United Methodist Board of Global Ministries–Women's Division, United Methodist Church Board of Church and Society, United Methodist Church Board of Global Ministries, U.S. Catholic Conference.

In addition to national organizations, the directory lists 125 state, local and regional organizations. A breakdown of the number of organizations per state is as follows: Alabama: 3,

America's judiciary has necessarily participated in this debate, and the Supreme Court has found that community values are a critical part of the calculus used by juries to determine the ultimate punishment. In an oft-cited passage from *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court described this calculus as follows:

> [A] jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death.
>
> And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society'.

391 U.S. at 519 and n. 15, 88 S.Ct. at 1775 and n. 15 (emphasis added).

Public concern over the death penalty is also reflected in the Supreme Court's debate over the constitutionality of the death penalty; *see e.g., Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (plurality found Georgia death penalty statute unconstitutional); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (an amended Georgia death penalty statute was found constitutional); Goldberg & Dershowitz, *Declaring the Death Penalty Unconstitutional,* 83 Harv.L.Rev. 1773 (1969–70), and the Court's continual concern that defendants are free to present, and that courts are free to review, character evidence. *Parker v. Dugger,* —— U.S. ——, 111 S.Ct. 731, 739–40, 112 L.Ed.2d 812 (1991) (in ensuring that the death penalty is not imposed arbitrarily and capriciously, it is important that appellate courts conduct an individual review of the circumstances of the crime and the *character* of the individual); *Mills v. Maryland,* 486 U.S. 367, 374, 108 S.Ct. 1860, 1865, 100 L.Ed.2d 384 (1988) (it is beyond dispute that in a capital case the sentencer may not be precluded from considering *any aspect* of the defendant's character as a mitigating factor).

2. Form of Ziccarelli's Speech

■ The form of Ziccarelli's speech, testimony under oath, also supports a finding that Ziccarelli's speech is a matter of public concern. Testimony before an official government adjudicatory or fact-finding body is inherently a matter of public concern. *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1578 (5th Cir.1989). Moreover, the Supreme Court has said "it is every man's duty to give testimony before a duly constituted tribunal." *Ullmann v. United States,* 350 U.S. 422, 439 n. 15, 76 S.Ct. 497, 507 n. 15, 100 L.Ed. 511 (1956).

After consideration of the content, context and form of Ziccarelli's speech, we find his speech is a matter of public concern.

B. *The Pickering Balance*

■ Since Ziccarelli's speech is a matter of public concern, we next must strike a balance between the Department's interest as an employer, in the effective functioning of its public enterprise, and Ziccarelli's interest in testifying at Jacobson's death penalty hearing. *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. The Department bears the burden of justifying the discharge on legitimate grounds. *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691. We find the Department has failed to meet this burden and that the balance overwhelmingly favors Ziccarelli.

In performing this balance, Ziccarelli's statement is not examined in a vacuum; the manner, time, and place of the statement, and the context in which the dispute over the statement arose, are relevant

Alaska: 1, Arizona: 3; Arkansas: 1, California: 7, Colorado: 2, Connecticut: 2, Delaware: 1, District of Columbia: 3, Florida: 5, Georgia: 7, Hawaii: 1, Illinois: 4, Indiana: 4, Iowa: 2, Kansas: 4, Missouri: 6, Montana: 3, Nebraska: 2, Nevada: 3, New Hampshire: 1, New Jersey: 3, New Mexico: 3, New York: 5, N. Carolina: 4, Ohio: 4, Oklahoma: 3, Oregon: 3, Pennsylvania: 6, Rhode Island: 2, S. Carolina: 3, S. Dakota: 1, Tennessee: 4, Texas: 5, Utah: 2, Vermont: 2, Virginia: 4, Washington: 1, W. Virginia: 2, Wisconsin: 2, Wyoming: 1.

factors. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. In weighing the Department's interest as an employer, relevant factors include whether the statement impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close-working relationships for which personal loyalty and confidence are necessary, or interferes with the regular operation of the enterprise. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899.

### 1. Ziccarelli's Trial Testimony

The manner, time and place of the speech weigh heavily in favor of Ziccarelli because the first amendment protects the right to testify at trial. *Melton*, 879 F.2d at 714; *Smith v. Hightower*, 693 F.2d 359, 368 (5th Cir.1982); *Moore v. Floro*, 614 F.Supp. 328, 335 (N.D.Ill.1985). The *Melton* case is instructive because it is almost identical to the facts before us.

In *Melton*, the Tenth Circuit found that a police officer's first amendment rights were violated when he was fired after he testified on behalf of the defense at a criminal trial. Under the *Pickering* balance test, the Tenth Circuit decided that Melton's interest in testifying at trial easily outweighed the City's interest in preventing the testimony. *Melton*, 879 F.2d at 714. In reaching that conclusion, the Tenth Circuit weighed a number of factors which are relevant to our discussion.

First, the Tenth Circuit held that the first amendment right to testify truthfully at trial is so significant that any disruption or impairment of the government's enterprise would have to be *extreme* in order to prevent the testimony. *Melton*, 879 F.2d at 714 (emphasis added). Second, the court believed that "Melton had a clear public duty to testify." *Melton*, 879 F.2d at 715. Finally, the court found that Melton had an interest in helping a friend who could be well-served by character testimony. *Id.*

Likewise, in our case, Ziccarelli has a first amendment right to testify truthfully at trial, a public duty to testify, and an interest in helping a friend who could not just be well-served by character testimony, but whose life may be saved. *See e.g., Mills*, 486 U.S. at 374, 108 S.Ct. at 1865. We therefore will follow the *Melton* court's guide and determine whether the disruption to the Department is extreme enough to outweigh Ziccarelli's interests in testifying.

### 2. Department's Rationale for the Unwritten Policy

We initially feel compelled to comment generally about the Department's unwritten policy. We are suspicious of the purpose of this unwritten policy, and our suspicion is underscored in this case by the Department's failure to clearly describe either the policy or its rationale.[6] Without the benefit of a document describing the policy, we are not even certain that Ziccarelli violated the policy.

For example, the Department first claims the policy requires correctional officers to be served with subpoenas before they can testify in court with respect to any aspect of their employment as a correctional officer. Department's Motion for Summary Judgment at pgs. 2 & 4. If this was the full extent of the policy, as conveyed to Ziccarelli, he could easily have understood that his character testimony at Jacobson's death penalty hearing did not violate the policy. Ziccarelli did not testify about his employment; he only testified about a friend's character.

Later, the Department alleges Ziccarelli was terminated for "voluntarily testifying *without notifying* his supervisors and without receiving a subpoena." (Emphasis added.) Department Memorandum in Support of Summary Judgment at pg. 6. (hereinafter cited as "Memorandum"). Thus, we assume, the policy must include some

---

**6.** The Department's failure to describe the unwritten policy caused us to search throughout the Department's papers in order to decipher the parameters of that policy. As we conducted this task, we could not help but question the veracity of the Department's assurances that Ziccarelli was aware of all aspects of this unwritten policy, a contention which Ziccarelli disputes. Ziccarelli's Reply Memorandum at pgs. 6–8. Because we will find in favor of Ziccarelli, we view this issue in favor of the Department, and we therefore assume Ziccarelli was aware of the unwritten policy.

notification provision. Even if Ziccarelli was told about this notification requirement, he still could reasonably have believed he was not violating the policy because of the nature of his testimony as noted before.

The Department's explanation of the rationale for the unwritten policy is even more vague. The Department makes many references to the fact that the policy is "related to security," Memorandum at pgs. 3 & 9, but utterly fails to explain how Department security is jeopardized by such testimony. The most complete explanation provided for the policy's rationale, albeit second hand through the Department's counsel, is as follows:

> [the Policy] merely requires notice to Department of Corrections officials who can then determine if requested testimony might jeopardize jail security. The policy addresses, among other things, relationships which exist or which may evolve between detainees and Correctional Officers. Common sense dictates that such relationships must be carefully balanced. It would be inappropriate for a detainee to believe that a particular guard could be convinced to testify on his behalf out of sympathy or past community ties, no matter how attenuated.

Additionally, with regard to the rule itself, the Department has an interest in ensuring that subpoenas are properly served, that the appropriate person responds, that the right documents are produced and that its employees are not indiscriminately making court appearances in which they testify about their jobs. The Department has an interest in receiving a subpoena as proof that an employee is actually required to testify and has actually spent his time at court. There are obvious liability concerns as well. It is not uncommon in any employment situation, either public or private, that subpoenas are required to secure an employee's testimony about his job. Nor is it uncommon to require that a supervisor be informed when an employee testifies, with or without a subpoena, upon matters related to the job.

Memorandum at pgs. 9–10.

■ Even if Ziccarelli has violated the policy, the Department has failed to show any relationship between the purpose of the policy and Ziccarelli's actions. Those aspects of the policy related to subpoenas have no applicability here because Ziccarelli was not fired for mishandling a subpoena. Ziccarelli did not testify during his scheduled work hours, so the portion of the policy directed to assuring that an employee does not use an alleged court appearance as a pretext to avoid work is also inapplicable. The Department has not explained what it means by "obvious liability concerns," and we cannot postulate how the Department could be exposed to liability for Ziccarelli's truthful character testimony. Finally, Ziccarelli did not testify about his job at the death penalty hearing; he only offered character testimony on behalf of Jacobson. Thus, the only aspect of the policy which is relevant to Ziccarelli's discharge is that portion concerned with jail security.

Nowhere does the Department explain how requiring an employee to be subpoenaed is necessary to promote jail security. The Department alludes to the concern that inmates might purposefully develop friendly relationships with guards in an effort to obtain favorable testimony in their behalf. The policy, however, cannot address that concern because the same officer, if subpoenaed by the inmate, would be required by law to testify truthfully, a fact recognized by Leake in his deposition. Leake Deposition at page 12. What we are left with is a suspicion that the unwritten policy may have a more nefarious purpose. Our suspicion is supported by comparing Leake's deposition testimony, taken under oath, to the Department's stated rationale for the policy. Leake testified as follows:

> Q. Could you explain to us the reason why an officer can't testify unless he or she has been subpoenaed in a criminal case?
>
> A. Well, we're concerned about any correctional officer who testifies in any

case that might impact upon the department. We're concerned if the officer is testifying in behalf of an inmate who might have been under his care and supervision.

Q. Could you explain to me, though, why you're concerned about the officer testifying without being subpoenaed?

A. Well, because *we would hope that he would not testify in any case unless subpoenaed.* We just don't, especially if it involves an inmate in the jail.

Q. Could you explain the difference between testifying with the subpoena and without a subpoena?

A. If he's testifying with a subpoena, that means that he is by law duty bound to testify and therefore we have no problem with that, but we have a problem with him as far as a matter of policy in volunteering to testifying, especially in the case involving an inmate in the jail.

Q. Could you explain why that has an impact on the jail if the correctional officer testifies without first being subpoenaed?

A. If [sic] could have an impact because we discourage any relationship established by an officer with an inmate at the jail, a relationship that might lead to him testifying in behalf of that inmate, that I'd have a problem with as a matter of policy.

Q. How does whether or not an officer receives a subpoena have an impact on that?

A. If the officer is subpoenaed then he is forced to testify by law.

Q. If he's not subpoenaed how does that—I am not sure if you understand my question or if I understand your answer. If an officer is subpoenaed he has to testify, and you don't stop him from doing so; is that right?

A. That's correct.

Q. If an officer is not subpoenaed then your policy is that he can't testify?

A. He should discuss the case, the merits of the case, the substance of the case, why he is volunteering to testify, and we want to know if his testimony may in fact impact upon not only that particular inmate but the inmates who are in the surrounding area or inmates that might be affected by his testimony.

Q. Other than—

A. Or more importantly, the security of the institution and if it would be threatened by that testimony.

Q. Other than what you told us, is there [13] any other reason for why the policy is that you don't testify if you're a correctional officer without first being subpoenaed.

A. We're saying that we cannot—we do not want a correctional officer testifying in any case without coming to us and discussing the merits of the case.

Q. *Do you try and talk the correctional officer out of testifying if he's been subpoenaed.*

A. *Not necessarily.*

Q. *What do you mean not necessarily, sometimes?*

A. *Depends upon the merits of the case.*

Leake Deposition at pages 10–13. (Emphasis added.) We do not know why the Department, as a matter of policy, would want to talk an officer out of testifying truthfully on behalf of a defendant at death penalty hearing.

Setting aside our concerns, we find that the Department has proffered no evidence that the policy impairs discipline by supervisory personnel or harmony among co-workers, has a detrimental impact on close-working relationships, or interferes with the regular operation of the Department. We conclude that the Department, to the extent it has any rationale for its policy, has not demonstrated any disruption or impairment of the functioning of its office, let alone an *extreme* disruption or impairment, that outweighs Ziccarelli's first amendment right to testify. We therefore find the *Pickering* balance weighs in favor of Ziccarelli, and that Ziccarelli has suffered a violation of his first amendment rights.

## CONCLUSION

For the reasons set forth above, we grant Ziccarelli's motion for summary judgment as to liability, deny his motions for injunctive relief and an expedited trial as being moot, and deny the Department's motion for summary judgment.