794 F.2d 1018
 Javier GOMEZ, Plaintiff-Appellant,
v.
The TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
and Roberto Vargas, Aurelio G. Valdez, Terry Bond, Diane
Cano, and Elisa Dale, Individually and in their official
capacities, Defendants-Appellees.
 No. 85-1668
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 July 21, 1986.
 Christie, Berry & Dunbar, Mark Berry, El Paso, Tex., for plaintiff-appellant.
 Toni Hunter, Asst. Atty. Gen., Austin, Tex., Fred Weldon, Dallas, Tex., for defendants-appellees.
 Appeal from the United States District Court for the Western District of Texas.
 Before CLARK, Chief Judge, WILLIAMS and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 In this suit against the Texas Department of Mental Health and Mental Retardation and various individuals, Javier Gomez alleged that he was terminated from state employment in retaliation for exercising his constitutional right to free speech. Although the jury found that the speech in question was a motivating factor in Gomez' discharge, the district court granted judgment in favor of the defendants. Because the communication in question did not address a "matter of public concern" within the meaning of Connick v. Myers, 461 U.S. 708, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), Gomez was not protected by the first amendment from discharge. We affirm.
 
 
 2
 * The El Paso State Center, a resident facility for treatment of the mentally ill and retarded, is operated by the Texas Department of Mental Health and Mental Retardation. The Life Management Center, an agency of El Paso County, provides outpatient services for patients discharged from the State Center. In March 1983, Javier Gomez was a probationary employee at the State Center. He provided group and individual counseling to resident patients, and he helped coordinate the transfer of patients from the State Center to the County Center. At the time of Gomez' employment, the length of patient stay at the State Center was an issue of some discussion between the two agencies, primarily because of its direct impact on the funding, work load, and other operational aspects of the County Center.
 
 
 3
 On July 12, 1983, an administrator at the State Center, Elisa Dale, sent out a memorandum concerning "Preparation for Briefer Client Lengths of Stay." The memorandum stated, in part:
 
 
 4
 I met with Dr. Briones today who strongly recommends that we reduce the length of stay of most clients admitted to the unit....
 
 
 5
 To prepare for this change in our approach to treating clients, we'll need to make adaptations to our treatment planning process, choice of treatment modalities and possibly staff coverages on the weekend.
 
 
 6
 During a routine meeting soon after he received this memo, Gomez told an employee of the County Center, Orlando Gonzales, that the State Center had changed its policy on length of patient stay. When Gonzales asked for written evidence to show to his superiors, Gomez gave him the memorandum.
 
 
 7
 The memorandum was eventually relayed to the Director of the County Center, Dr. Lee Yudin, who telephoned the Director of the State Center, Dr. Aurelio Valdez, to discuss whether the length of patient stay was being changed without his knowledge. Valdez denied that there was any official change in policy, and he later asked Elisa Dale for a copy of her memorandum. Soon thereafter, Dale convened her unit team, which included Gomez, and asked who had told the County Center that there was a new policy regarding length of patient stay. Gomez raised his hand, and Dale asked him to call the County Center and tell them that the contemplated change in length of patient stay was not "official policy."
 
 
 8
 Gomez telephoned both Gonzales and Gonzales' supervisor at the County Center, told them that the memo did not represent official policy, and added that he could be fired for having presumed to say that it was. When this information filtered up the County Center's chain to Dr. Yudin, it resulted in another telephone conversation between the two directors, this time concerning allegations that an employee at the State Center was being discharged for disclosing the memorandum. Dr. Valdez asked an administrator, Diane Cano, to investigate the allegations. Cano held a meeting of all unit caseworkers and psychologists in her office, and asked if anyone had been threatened with discharge for revealing information regarding length of patient stay; all employees, including Gomez, denied that they had been threatened.
 
 
 9
 Later the same day, Dale went to Valdez and recommended that Gomez be discharged. Her recommendation was approved, and the next day, Gomez' probationary employment was terminated by Terry Bond, the personnel director at the State Center.
 
 
 10
 Gomez filed a Sec. 1983 suit against the Texas Department of Health and Mental Retardation, Aurelio Valdez, Terry Bond, Diane Cano, and Elisa Dale, alleging that he had been discharged for having exercised his first and fourteenth amendment rights of free speech. Trial was conducted before a jury. At the close of Gomez' case, the defendants moved for a directed verdict, asserting, among other grounds, that the speech in issue was not constitutionally protected because it was not addressed to a matter of public concern. The motion was denied.
 
 
 11
 At the charge conference, the court refused Gomez' request that the jury be instructed that the speech was, as a matter of law, constitutionally protected. Gomez did not otherwise object to the proposed charge, which asked no fact questions upon which the issue of protected speech would be decided.
 
 
 12
 The jury returned its verdict on special interrogatories, finding that Gomez' disclosure to the County Center of the contemplated policy change was a substantial factor in his discharge; that Dale, but none of the other individual defendants, was motivated to discharge him because of the disclosure; that absent disclosure Gomez would not have been discharged; and that Dale acted willfully, intentionally, or with callous and reckless indifference to Gomez' rights. The jury found actual damages of $1,785.00, but awarded no exemplary damages. The defendants later filed a motion for "judgment notwithstanding the verdict," requesting that judgment be entered in their favor and arguing that the speech was not constitutionally protected. Correctly viewing the motion as one that urged judgment on a controlling question of law, the court properly treated it as a "motion for judgment" rather than as a motion for judgment notwithstanding the verdict. Finding that Gomez' communication and acts were, as a matter of law, not constitutionally protected, the court entered judgment in favor of defendants.[1]
 
 
 13
 On appeal, Gomez argues that because the speech in question was directed to a matter of public concern, the district court erred in holding that the first amendment did not protect him from discharge.
 
 II
 
 14
 A state may not condition public employment in a manner that infringes an employee's constitutionally protected interest in freedom of expression. Connick v. Myers, 461 U.S. 1684, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). However, where an employee's speech does not fall under the rubric of "matters of public concern," a state employer responding to such speech has the same range of personnel choices available to a private employer. See id. at 1690. In this case, the jury found that Gomez was fired by the State Center because he passed certain information on to the County Center. Whether that termination infringed Gomez' first amendment rights turns on whether or not Gomez was speaking "as a citizen upon matters of public concern." Id. An affirmative answer to this question would not end the analysis; we would then have to determine whether the government's interest in the efficient operation of its office outweighed society's interest in protecting Gomez' freedom of expression. Id. at 1691-1692; McPherson v. Rankin, 786 F.2d 1233, 1236 (5th Cir.1986). Because we find that Gomez' speech was not addressed to a matter of public concern, we need not engage in balancing the competing first amendment and government interests.
 
 
 15
 In determining whether Gomez' communication addressed a matter of public concern, we must examine its "content, form, and context ... as revealed by the whole record." Connick, 103 S.Ct. at 1690 (footnote omitted). Gomez himself testified that the circumstances of his conversation and disclosure of the memorandum were as follows:
 
 
 16
 [Gonzales] mentioned to me that my clients weren't lasting very long. And I said, well, yeah, that seems to be the trend. And not only that, but now that you bring it up, we were even told that we have to get ready for a shorter length of stay. And he said, well, do you have any--I never heard of that, do you have anything in writing, and at that time I did, I had this and so I showed it to him.
 
 
 17
 This statement and the disclosure of the memorandum, which took place in the course of a routine meeting whose purpose was to coordinate the transfer of patients from one government facility to another, was made to an employee of the County Center responsible for some of the transferred patients. Plainly, Gomez' purpose in relating the information was to advise the employee of expected reductions in the length of time patients would remain at the State Center and to warn of the additional burden the change would place on Gomez' interlocutor and on the County Center generally.
 
 
 18
 Gomez points to testimony in the record that "changes in length of stay were on everybody's tongue" as evidence that his communication addressed a matter of public concern. "Everybody," however, referred not to the public generally, but rather to the employees of the agencies involved, who quite naturally were interested in any job-related changes they might personally experience under the proposed policy. The record does not show that the topic was a matter of public debate or even interest in the community at large. To agree that simply because the topic was a matter of inter-agency debate it was also a matter of public concern for first amendment purposes, would suggest "that all matters which transpire within a government office are of public concern." This proposition was firmly rejected in Connick because it would mean that in a government office "virtually every remark ... would plant the seed of a constitutional case." 103 S.Ct. at 1691; C.F. Terrell v. University of Texas System Police, 792 F.2d 1360 (5th Cir.1986).
 
 
 19
 Gomez next argues that his statement was addressed to a matter of public concern because "the proper treatment of the mentally ill in El Paso, Texas [was] at stake." This argument must also be rejected. Almost anything Gomez might say about the internal office procedures or policies of the State Center could have some bearing on the Center's treatment of the mentally ill. If all such statements were treated as addressing "matters of public concern," government employees could with impunity express any job-related criticisms they might choose, in contravention of Connick's admonition that the Constitution "does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State." 103 S.Ct. at 1690.
 
 
 20
 Whatever the significance of Gomez' speech and conduct might have been, he was not seeking to alert the public to any actual or potential wrongdoing or breach of the public trust by the administrators of the State Center. The proposed policy change, which was eventually implemented, was within the sole discretion and responsibility of the State Center's Director acting under policy directives from the Texas Department of Mental Health and Mental Retardation. The County Center was required to comply with whatever decision was reached by the State Center as to the length of patient stay--it had no legal right to participate in the decision or interfere with it.
 
 
 21
 Furthermore, any implication that Gomez was communicating the information in order to question the adequacy of care being provided to the patients at the State Center is simply not supported by the record. Rather, the focus of the communication, and the principal reason it was of interest to Gonzalez or any other employee of the County Center was because of the additional burden it would place on the financial resources and administrative staff at the County Center, a concern of the employees of the two agencies, but not of any special interest to the public generally. Indeed, if Gomez had communicated identical information in a public forum, it would have conveyed no more than that a bureaucratic change affecting the relative administrative burdens of two government agencies was being considered. A statement "not otherwise of public concern does not attain that status because its subject matter could, in other circumstances, have been the topic of a communication to the public that might be of general interest." Connick, 103 S.Ct. at 1691 n. 8.
 
 
 22
 Gomez also suggests that his speech was addressed to a matter of public concern because the allocation of public funds was implicated by the proposed policy change. As noted above, however, any change in the expenditure of public funds would be the result of a decision within the sole legal discretion of the State Center's Director. It was therefore unlike a proposed use of funds under a school bond issue, which would require free and open public debate on the topic to ensure informed decisionmaking by the electorate. Cf. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
 
 
 23
 Gomez finally suggests that the information he communicated addressed a matter of public concern because statements on agency policy are public under applicable state law. See Tex.Rev.Civ.Stat.Ann. art. 6252-17a Secs. 6(13), 6(14) (Vernon Supp.1986). Regardless of whether Gomez has correctly characterized state law, his argument fails. Though a state may choose to provide broader rights under its own laws than those granted by the federal Constitution, see Pruneyard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), it has no power to enlarge the scope of federal rights themselves. See Stern v. Tarrant County Hospital District, 778 F.2d 1052, 1059-60 (5th Cir.1985) (en banc). Whether or not the state of Texas would characterize the speech in question as addressed to a matter of public concern is therefore irrelevant to the federal issue.
 
 
 24
 The district court, in determining that Gomez was not protected from termination, opined that Gomez "used questionable judgment in disclosing the proposal to change patient stays at the State Center," not only because the proposed policy was not yet a foregone conclusion, but also because "such a policy change would have best been presented and explained by the State Center's authorized administrators." We need not, however, speculate as to the reasons Gomez' supervisor requested his termination; absent a showing that the termination was precipitated by a speech on a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to [an] employee's behavior." Connick, 103 S.Ct. at 1690.
 
 The judgment of the district court is
 
 25
 AFFIRMED.
 
 
 
 [1]
 Under Connick v. Myers, 461 U.S. 1684, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the legal question of whether speech is directed to a "matter of public concern" is obviously affected by factual findings. See McPherson v. Rankin, 786 F.2d 1233, 1237 (5th Cir.1986). Gomez waived his right to jury trial with respect to any disputed facts upon which this dispositive legal issue would be based when he failed to demand submission of appropriate questions to the jury before it retired. See Fed.R.Civ.P. 49(a)