Ramakrishna C.V. RAO, Plaintiff,

v.

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION; Jo Ivey Boufford, both individually and in her capacity as President of the New York City Health and Hospitals Corporation; Anthony Japha, both individually and in his capacity as Vice President of the New York City Health and Hospitals Corporation; Dennis Newman, both individually and in his capacity as Chief Engineer of the New York City Health and Hospitals Corporation; Robert Weigand, both individually and in his capacity as Deputy Chief Engineer of the New York City Health and Hospitals Corporation; and Paul Rozsypal, both individually and in his capacity as Group Director of the New York City Health and Hospitals Corporation, Defendants.

Nos. 89 Civ. 2700 (JGK), 89 Civ. 7060.

United States District Court,
S.D. New York.

Aug. 16, 1995.

Michael H. Sussman, Sussman Law Offices, Goshen, NY, for plaintiff.

Paul A. Crotty, Corporation Counsel of City of New York, New York City, for defendants.

KOELTL, District Judge:

After a nine day trial of these consolidated cases, a jury returned a verdict, based on answers to special interrogatories, finding for the plaintiff, Ramakrishna Rao, against defendants Anthony Japha, Dennis Newman, and Robert Weigand on the plaintiff's claim that their termination of his employment at the New York City Health and Hospitals Corporation ("HHC") violated his First Amendment rights. The jury awarded compensatory damages of $100,000 under 42 U.S.C. § 1983. It found the remaining individual defendant, Paul Rozsypal, not to be liable for any violation of the plaintiff's First Amendment rights and found that none of the defendants terminated the plaintiff's employment on account of his national origin.[1] The jury also found that the wrongful actions of the liable defendants were not taken pursuant to an official policy, custom, or practice of HHC and thereby found HHC not to be liable to the plaintiff. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In addition to his § 1983 claims for violation of First and Fourteenth Amendment rights, the plaintiff pleaded claims for violations of Title VII of the Civil Rights Act of 1964 which were not presented to the jury, because this action was filed prior to the 1991 amendments to the Act. *See Postema v. Nat'l League of Professional Baseball Clubs*, 998 F.2d 60, 61–62 (2d Cir.1993) (holding that 1991 Civil Rights Act amendments to Title VII providing for jury trials are not retroactive). After trial, the Court dismissed the Title VII claims in an opinion and order dated April 7, 1995 in accordance with the jury's finding that Rao had not been terminated on account

---

1. Defendant Jo Ivey Boufford was dismissed from the action prior to trial.

of his national origin. *See Rao v. New York City Health and Hosp. Corp.*, 882 F.Supp. 321 (S.D.N.Y.1995). The defendants now move for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b).

At trial, all of the defendants admitted to having participated in the termination of the plaintiff's employment with HHC in March, 1987. The jury was asked to determine: 1) whether the individual defendants' decisions to terminate Rao's employment were motivated by his national origin, and 2) whether Rao had engaged in various forms of speech that the Court found to be protected by the First Amendment and, if so, whether such speech was a substantial or motivating factor in the defendants' termination decisions. The jury found that for defendants Japha, Newman, and Weigand the following instances of protected speech were substantial or motivating factors in their decisions to terminate Rao: (1) Rao's verbal complaints about the failure of a contractor, Joseph L. Muscarelle, Inc., to comply with the terms of its contract with HHC for work to be done at the Cumberland Neighborhood Family Care Center in Brooklyn and (2) Rao's December 15, 1986 memorandum to defendant Weigand complaining about Muscarelle's alleged failings and alleged extortionate threats made by Free At Last, a community group allegedly demanding money and jobs at the project.[2] The jury also found the liable defendants did not prove by a preponderance of the evidence that they would have terminated Rao's employment even if they had not considered his protected speech. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (holding that once the finder of fact determines that protected speech was a substantial or motivating factor in a municipal defendant's adverse action against a municipal employee, the finder of fact must consider whether the defendant has established a defense by proving by a preponderance of the evidence that the defendant would have taken the same action in the absence of the protected speech). Thus, the jury's answers to the special interrogatories established that defendants Weigand, Japha, and Newman terminated Rao's employment in violation of 42 U.S.C. § 1983.[3]

The defendants have moved for judgment as a matter of law, arguing that the speech that the jury found to have been a substantial or motivating factor in Rao's termination was not protected by the First Amendment, or, alternatively, if it was protected, the defendants are entitled to qualified immunity, because they reasonably believed their actions were not violative of the plaintiff's rights. For the reasons stated below, the defendants' motion is denied.

### I.

In the opinion dated April 7, 1995, the Court made the following findings of fact in dismissing the plaintiff's Title VII claim in conformance with the finding of the jury that he was not terminated on account of his national origin. *See Rao*, 882 F.Supp. 321. On July 21, 1986, HHC hired plaintiff Ramakrishna Rao as a Director, Engineering and Facilities Services, Capital Programs, on the recommendation of defendant Robert Weigand who was Senior Deputy and Chief Engineer, Capital Programs. During his tenure at HHC, Rao's superiors were defendants Weigand; Paul Rozsypal, Group Di-

---

**2.** In its very careful verdict, the jury concluded that while Rao verbally complained to his superiors about payoffs by contractors to Free At Last and demands by other HHC officials for payoffs to Free At Last, such verbal complaints were not a substantial or motivating factor in the defendants' decisions to terminate him. The jury also found that Rao complained to Mayor Koch about mismanagement at the Cumberland site and the alleged failure of HHC to attempt to remedy it, but that these complaints too were not a substantial or motivating factor in his termination. The jury found that Rao did not complain to HHC officials about a pattern of discrimination at HHC.

**3.** Section 1983 provides in relevant part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

rector, Construction Management, Capital Programs; Dennis Newman, Assistant Vice President and Chief Engineer, Capital Programs; and Anthony Japha, Senior Assistant Vice President, Capital Programs.

Rao was initially assigned as Director of HHC's North District, which encompassed the Bronx and Upper Manhattan. In the North District, Rao had encountered significant difficulties with a subordinate, Gary Yates, whom Rao considered to be insubordinate. In December, 1986, the defendants transferred Rao to a temporary assignment as the on-site project manager at the Cumberland Neighborhood Family Care Center in Brooklyn, which was undergoing extensive renovation in HHC's most expensive new construction project at the time. Rao authored a December 15, 1986 memo to defendant Weigand (attached hereto as Appendix A) complaining about numerous aspects of the Cumberland project, including alleged deficiencies in the performance of Joseph L. Muscarelle, Inc., a contractor, and of alleged extortion attempts by a community action group, Free At Last. Weigand was not pleased with the memo, alleging at trial that the reason for his dissatisfaction was that he was already aware of virtually everything reported in it. Rao testified:

> Mr. Weigand was furious. He indicated that over the phone, he had no time to read my December 15th memorandum, Exhibit 21, and I should not be writing or sending such memoranda in the future without his approval. And he immediately said that is not why I sent you to Cumberland.

Tr. of Nov. 23, 1994 at 14. Rao also testified that after reading the memorandum Weigand said that Rao should look for another job. *Id.*

On December 23, 1986, Rao met with defendant Japha and they discussed some of Rao's concerns about his employment situation. Japha told Rao that if he could not get along with Weigand, he should find another job. On or about February 10, 1987, defendant Weigand informed Rao that his services were no longer required and offered him the option of resigning. Weigand had discussed the decision to terminate Rao with both Ja-

pha and Newman who concurred. On February 13, 1987, Rao was informed that he had been given an unsatisfactory performance evaluation. Rao received a copy of the evaluation on February 23, 1987. On or about March 6, 1987, Rao received a letter informing him that his employment with HHC would be terminated effective March 13, 1987.

## II.

▋ A public employee may not be terminated due to the exercise of the employee's First Amendment rights. *See Luck v. Mazzone,* 52 F.3d 475, 476 (2d Cir.1995) ("A public employee does not relinquish her First Amendment rights to comment on matters of public interest by virtue of government employment.") (*citing Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) and *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). To prevail on a claim for wrongful termination in violation of First Amendment rights, a public employee must show (1) that the speech at issue was constitutionally protected and (2) that it was a substantial factor in the decision to terminate the employment. *Mount Healthy,* 429 U.S. at 286, 97 S.Ct. at 575; *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1057–59 (2d Cir.1993). If the plaintiff proves these elements, a public employer and its agents may avoid liability by proving by a preponderance of the evidence that they would have terminated the plaintiff even in the absence of protected conduct. *Mount Healthy,* 429 U.S. at 286, 97 S.Ct. at 575; *White Plains Towing,* 991 F.2d at 1059.

▋ To be protected by the First Amendment and by judicial remedies, speech by a government employee must address a matter of public concern. *Connick,* 461 U.S. at 140–49, 103 S.Ct. at 1686–91. However, speech addressing a matter of public concern will only be protected if the interests of the employee, as a citizen, in commenting upon matters of public concern outweigh the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734 ("[T]he

State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). *Pickering* balancing is not at issue in this case, because the defendants have not argued that the plaintiff's allegedly protected speech interfered with administrative efficiency to such a degree as to justify the plaintiff's termination. *See* Tr. 954–55, 1045, 1085.[4] Rather, the defendants argue that the plaintiff's speech was not protected, because it did not address a matter of public concern. Whether a particular instance of speech relates to a matter of public concern is a question of law to be answered by the Court. *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Luck,* 52 F.3d at 476.

Rao's December 15, 1986 memorandum to defendant Weigand expressed Rao's concerns about the progress of the Cumberland Neighborhood Family Care Center project which he had the duty of managing. Rao's official duties did not require him to write the memorandum and it was not solicited by Weigand, who was in fact displeased that Rao had written it. The memorandum sets forth various shortcomings of the project's general contractor, Joseph L. Muscarelle, Inc., and documents them by reference to prior memoranda by Rao which were attached to it, including memoranda to Sanford Krusch, Muscarelle's representative at the project. Prior to listing fourteen alleged failings of the contractor, the December 15 memorandum states:

> Please refer to our discussions on December 13, 1986, regarding the failure of our Construction Consultant in providing the Construction Management Services we contracted for, my letters and memoranda seeking your approval for the proposed

remedial action, copies attached, and the threats from Jameson of Free At Last. Any further delay in taking appropriate action will seriously prejudice our interests.

> The project is behind schedule as such and it will *not* be completed on time and within budget. The extent of delay and the budget slip depend solely on the performance of our Construction Consultant which, as of this date, is far from satisfactory.

After listing the shortcomings of Joseph L. Muscarelle, Inc., the memorandum concludes:

> We are paying the Construction Consultant around $1,000,000 and based on the IFA fee of around $1,000,000 we can support a staff of twelve (12) at $80,000 per individual. If you can give me one (1) Construction Manager, two (2) Superintendents of Construction and (1) PAA, I can bring this project to a satisfactory conclusion without the Construction Consultant.

> I am also seeking your help in view of the threats from Jameson of Free At Last who wants $50,000 per year from us. (*See,* My memorandum dated 12/5/86 to you.)

Rao gave the following testimony at trial regarding his knowledge of the community group Free At Last at the time that he wrote the December 15 memorandum:

> Free At Last is or was a locally-based minority organization seeking jobs for black, African and other minorities in the Cumberland area. . . . The method they were using was extortion. They wanted $50,000 per year under the table so that there would be peace on the project. If that amount is not paid, then the work would be stopped and people would get hurt.

---

**4.** Because the defendants conceded at trial that there was no evidence that the plaintiff's speech was disruptive or that they fired him because of speech that they believed to be disruptive, and because the defendants explicitly disclaimed any reliance on *Pickering* balancing, this case does not raise the issue of the ability of a governmental employer to fire an employee for speech that is reasonably perceived to be disruptive. *Cf. Waters v. Churchill,* —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Jeffries v. Harle-*

*ston,* 52 F.3d 9 (2d Cir.1995), *petition for cert. filed,* 60 U.S.L.W. 3422 (U.S. Jan. 14, 1992) (No. 92–212). The defense in this case was not that the defendants believed that the plaintiff's speech would in any way impair governmental functioning or efficiency, but rather that the defendant lacked the competence to perform his job, as reflected in his final performance evaluation. The jury was presented with that defense and rejected it.

Tr. of November 23, 1994 at 16. Rao's December 5, 1986 memorandum to Weigand states:

> Jameson of Free At Last did not like the response I gave him just like we discussed. He called me "headstrong" in [another employee's] presence and left with an implied threat that more ... to follow.
>
> Need your help before this implied threat becomes an actuality.

At trial, the defendants moved for judgment as a matter of law at the close of the plaintiff's case. In denying the motion, the Court declared:

> I'm certainly satisfied at this point that there are specific statements that would be matters of public concern taking into account all of the Second Circuit cases with respect to complaints by public officials with respect to matters of public concern, whether those are matters reported to investigative authorities or to superiors.
>
> For example, the December 15th memo is a statement about specific deficiencies by a contractor on an important city project, as well as an allegation with respect to the possibility of an improper payment associated with that project. That certainly would be a matter of public concern. And there is no evidence that the possible disruption from issuing such a memo in the employment context would take that memo out of the context of protected speech.

Tr. of December 5, 1994 at 955. The motion for judgment as a matter of law was renewed and denied again at the close of the case. *Id.* at 1045.

■ Addressing the issue for the third time, the Court again finds that Rao's December 15, 1986 memorandum to defendant Weigand and its attachments, as well as his verbal complaints about the failure of Joseph L. Muscarelle, Inc. to comply with the terms of its contract with HHC, constitute speech on a matter of public concern.

> The Supreme Court has instructed that: Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.... We hold only that when

a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90.

■ A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents is not likely to address a matter of public concern. *Thomson v. Scheid,* 977 F.2d 1017, 1021 (6th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2341, 124 L.Ed.2d 251 (1993); *Considine v. Board of County Comm'rs,* 910 F.2d 695, 700 (10th Cir.1990); *Koch v. City of Hutchinson,* 847 F.2d 1436, 1443 (10th Cir.) ("[C]ourts which have addressed the issue have declined to establish a per se rule exempting speech made in the course of an employee's official duties, but have viewed that fact as militating against a finding that the speech addressed matters of public concern."), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). However, the fact that an employee is speaking in the employee's capacity as an employee in furtherance of official duties does not preclude a finding that the employee is speaking on a matter of public concern. *Koch,* 847 F.2d at 1442 (holding that communications made in the course of an employee's official duties are not per se exempted from First Amendment protection); *Erickson v. Board of County Comm'rs,* 801 F.Supp. 414, 420–21 (D.Col.1992). Also, "[t]he mere fact that a public employee chooses to discuss privately his concerns with his employer as opposed to expressing his views publicly does not alter the analysis." *Ezekwo v. New York City Health and Hosp. Corp.,* 940 F.2d 775, 781 (2d Cir.1991) (citing *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 695–96, 58 L.Ed.2d 619 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that this freedom [of speech] is lost to the public employee who arranges to communicate privately with his

employer rather than to spread his views before the public.")), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749. The fundamental question is whether the employee is seeking to vindicate personal interests or to bring to light a "matter of political, social, or other concern to the community." *See Connick,* 461 U.S. at 146–148, 103 S.Ct. at 1689–90; *see also Ezekwo,* 940 F.2d at 781 (affirming denial of First Amendment claim, because "Our review of her prolific writings convinces us that Ezekwo was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor.").

■ An employee seeking to bring to light actual or potential wrongdoing or a breach of public trust by public employees or agencies is addressing a matter of public concern, *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690, but a matter of public concern need not involve an allegation of breach of public trust. *See, e.g., Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Rao's December 15 memorandum and its attachments, as well as the verbal complaints about Muscarelle's performance, address matters of public concern—alleged deficiencies in a contractor's performance on an important public project and alleged extortion attempts by a community group. It is apparent from the entire record and from the Court's observations of the witnesses and their demeanor that Rao's primary intent in writing the memorandum and making his verbal complaints was not to further his own professional development, but to make his superiors aware of problems in the management of a major city project and of perceived extortion attempts. Rao endeavored to solve the management problems by suggesting a solution to them, and he was requesting guidance in dealing with the extortion attempts while alerting his superiors of their continuation. The memorandum was not solicited by defendant Weigand, but was written by Rao on his own initiative. Rao's attempt to give his superiors the "big picture" of the problems at the Cumberland project and to suggest a solution was the act of a public em-

ployee acting as a citizen addressing a matter of public concern. This is not a case like *Ezekwo* where a public employee is seeking to protect his or her career. *Cf. Ezekwo* 940 F.2d at 780–781.

This case is similar to *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41 (2d Cir. 1983). There, a former director of nursing at Harlem Hospital complained that HHC demoted and fired her because she disclosed illegal and wasteful practices at the hospital to the HHC's Inspector General's Office, including excessive billings by independent licensed agencies whose nurses worked at the hospital and anonymous threatening phone calls made to her in response to her efforts to mitigate the problems. The court held:

> An allegation of corrupt and wasteful practices at a large municipal hospital, made to the city official empowered to investigate such charges, obviously involves a matter of public concern. The matters of which Rookard complained were her proper concern; as Director of Nursing, it was her duty to do as she did. There is no suggestion that Rookard's speech impaired her ability to perform her job, or impeded the regular operation of Harlem Hospital.... That Rookard's speech was made privately, rather than publicly, did not remove it from First Amendment protection.

*Rookard,* 710 F.2d at 46 (citation omitted).

■ At trial, the defendants alleged that Rao's suggestion that the project be completed in-house, without the aid of a construction consultant, was seriously flawed. However, the viability of Rao's proposed solution is irrelevant to the question of whether he was speaking on a matter of public concern. Defendant Weigand also testified that he was displeased with Rao's memorandum, because he was already aware of everything contained in it. Tr. of Nov. 29, 1994 at 364–65. He did however acknowledge that Rao's suggestion that the project be completed in-house was new. *Id.* at 365–66. However, the reason for Weigand's displeasure with the memorandum is irrelevant to the question of whether it addresses a matter of public concern.

In arguing that the December 15 memorandum and Rao's verbal complaints about the shortcomings of Joseph L. Muscarelle, Inc. do not address matters of public concern, the defendants rely primarily on *Koch v. Hutchinson,* 847 F.2d 1436 (10th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). In *Koch* the court held that a fire marshal's report as to the cause of a fire did not constitute speech on a matter of public concern. Koch was demoted from his position as Fire Marshal, because he issued a report concluding that a fire had been caused by arson and failed to indicate in the report that a laboratory test suggested that a cracked gas valve was a possible cause. Investigations conducted by others concluded that the fire was not caused by arson. The court held that although communications made in the course of a public employee's official duties are not exempt per se from First Amendment protection, Koch's memo was not on a matter of public concern, because it was "simply one of many routine official reports which are processed through the City's local governmental agencies on a daily basis," it was not helpful to the public in evaluating the conduct of the government, and it was not in any way motivated or inspired by alleged government improprieties or by a desire to expose those improprieties. *Koch,* 847 F.2d at 1447–48. Unlike Koch's report, Rao's December 15 memorandum was not a routine communication, it would be helpful to the public in evaluating the conduct of the government, and it was motivated by a desire to correct, if not expose, shortcomings in the execution of an important government project.[5]

At trial, the defendants did not argue that Rao's December 15 memorandum and his other complaints about the shortcomings of Joseph L. Muscarelle, Inc. interfered with the efficient operation of the Health and Hospitals Corporation to a degree sufficient to deprive the speech of First Amendment protection under the *Pickering* balancing test. The defendants now argue that the *Pickering* analysis is relevant to this case not because Rao's complaints directly interfered with the efficient operation of the agency, but because they demonstrated that Rao himself was not efficient and competent and thus provided a legitimate basis for his termination. This argument does not fall within the traditional conception of *Pickering* balancing, but finds its origin in a footnote in *Pickering* in which the Court observed:

> [T]his case does not present a situation in which a teacher's public statements are so without foundation as to call into question his fitness to perform his duties in the classroom. In such a case, of course, the statements would merely be evidence of the teacher's general competence, or lack thereof, and not an independent basis for dismissal.

*Pickering,* 391 U.S. at 573 n. 5, 88 S.Ct. at 1737 n. 5; *see also, Koch,* 847 F.2d at 1450 ("Furthermore, we hold that the City was entitled to evaluate Koch's official report, prepared and submitted in the course of his normal duties as Fire Marshal, as a reflection upon his ability and competence to perform his job.").

In this case, even if Rao's proposal for HHC to complete the Cumberland project in-house was not feasible, the December 15 memorandum did not display a level of incompetence sufficient to warrant his termination. At trial, the defendants testified that Rao was technically competent, but that his incompetence as a manager was demonstrated by his efforts to supervise Muscarelle and by his actions at his previous assignments. The jury did not find this testimony credible, because it specifically found that none of the defendants would have terminated Rao if they had not considered his protected speech. That finding is entitled to considerable deference. Interpreting the evidence in the light most favorable to Rao, this Court cannot

---

5. Similarly, the other cases relied on by the defendants in which employee speech was found not to address a matter ·of public concern are inapposite. For example, in *Gomez v. Texas Dep't of Mental Health and Mental Retardation,* 794 F.2d 1018 (5th Cir.1986), the court found that the communication at issue was made in the course· of a routine meeting, that it was not intended to alert the public of any wrongdoing, and that it did not relate to a topic that was of interest in the community at large, but one that was of interest only within the government. *Gomez,* 794 F.2d at 1021–22.

decide as a matter of law that the December 15 memorandum, or Rao's verbal complaints about Joseph L. Muscarelle, Inc., demonstrated such incompetence as to warrant his termination. *See Vasbinder v. Ambach*, 926 F.2d 1333, 1339–40 (2d Cir.1991) (denying judgment as a matter of law and holding that it is not to be granted where "the evidence, viewed in the light most favorable to the party that secured the verdict, was sufficient to allow a reasonable juror to arrive at the verdict rendered" and that "the court must give deference to all credibility determinations made by the jury and to all reasonable inferences from the evidence that the jury might have drawn in favor of the nonmoving party"). Indeed, there was more than sufficient evidence that Muscarelle was not living up to its contract and that the demands of Free At Last at the project were a cause of major disturbance. Rao's reporting of these facts to his superiors was hardly evidence of incompetence. A major thrust of the defendants' arguments at trial was not that the complaints about Muscarelle and Free At Last were not accurate, but rather, that Rao's superiors were already aware of them and were handling the issues. *See* Tr. 364–67, 502–514. But there was more than sufficient evidence to conclude that the problems had not been handled and that Rao's raising of the issues did not bespeak incompetence, but rather an intent to see major difficulties with an important public project rectified.

For the foregoing reasons, the Court finds that Rao's December 15 memorandum and his verbal complaints about the performance of Joseph L. Muscarelle, Inc. are protected by the First Amendment.

### III.

The defendants have also moved for judgment as a matter of law on the ground that they are qualifiedly immune from suit. Although the defendants raised this affirmative defense in their answer, they did not raise the issue of qualified immunity when they moved for judgment as a matter of law at the close of the plaintiff's case or when they renewed the motion at the close of all the evidence. A motion for judgment as a matter of law prior to submission of a case to the jury must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed.R.Civ.Proc. 50(a)(2). Rule 50(b) provides for the renewal of a motion for judgment as a matter of law after entry of judgment when such a motion was made at the close of all the evidence.[6] Therefore, an issue not raised in a motion for a directed verdict (now called a motion for judgment as a matter of law) may not be raised on a motion for judgment n.o.v. (now called a "renewed motion for judgment as a matter of law"). *See Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993) ("These two rules [Fed.R.Civ.P. 50(a), (b)] read together limit the grounds for judgment n.o.v. to those specifically raised in the prior motion for a directed verdict.").[7]

6. Rule 50(b), in part, states:

Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. Fed.R.Civ.Proc. 50(b).

7. In *Lambert v. Genesee Hosp.*, 10 F.3d 46 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994), the Court of Appeals explained:

We note that at times courts have been lax in enforcing this specificity requirement at the directed verdict stage to preserve an issue for a j.n.o.v. motion, although more recently courts have more rigorously exacted compliance with the specificity requirement.

If there were any doubts remaining as to the continued vitality of cases which disregarded the specificity requirement, the recent amendments to Rule 50 laid these doubts to rest. Although the amendments did not change the substantive standard for evaluating either a motion for a directed verdict or a motion for a j.n.o.v., instead merely renaming these respective motions, the Advisory Committee's Notes indicate that the specificity requirement is obligatory and ensures that the other party is made aware of any deficiencies in proof that may have been overlooked. *See* Fed.R.Civ.P. 50 advisory committee's notes ("The articulation is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof."). The Notes explicitly state that the "revision thus alters the result in cases in which courts have used vari-

In *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers,* 34 F.3d 1148 (2d Cir.1994), the Court of Appeals held:

> [J]udgment as a matter of law is limited to those issues "specifically raised in [a] prior motion for a directed verdict." [*Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993) ]. . . . "The rule is well established that a motion for directed verdict at the close of all the evidence is a prerequisite for [judgment as a matter of law]." *Hilord Chemical Corp. v. Ricoh Electronics, Inc.,* 875 F.2d 32, 37 (2d Cir.1989). Moreover, this procedural requirement may not be waived as a mere technicality. *See Redd v. City of Phenix City, Ala.,* 934 F.2d 1211, 1214 (11th Cir.1991). . . .
>
> Thus, if an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is "required to prevent manifest injustice." [*Baskin v. Hawley,* 807 F.2d 1120, 1134 (2d Cir.1986) ].

*Cruz,* 34 F.3d at 1155.[8]

■ Therefore, because the defendants did not move for judgment as a matter of law at the conclusion of all the evidence on the grounds of qualified immunity, they should not be permitted to "renew" such a motion after entry of judgment unless "manifest injustice" would result if the motion were not granted. As explained below, no manifest injustice will result from denying the motion because there is no substantive merit to the motion in any event.

In this case, the plaintiff seeks to waive any procedural objection to the defendants' failure to comply with Rule 50(b), apparently confident that the defendants are not entitled to qualified immunity in any event and seeking to avoid an appeal on the issue of whether the defendants' neglect to raise qualified immunity in their motion for a directed verdict is excusable. In *Gibeau v. Nellis,* 18 F.3d 107 (2d Cir.1994), the Court of Appeals concluded that although the plaintiff had waived his right to make a judgment n.o.v. motion, because he did not move for a directed verdict at the close of the trial, it would nonetheless consider the merits of his appeal from the denial of his motion for judgment n.o.v., because the defendants failed to raise the issue of waiver in the district court: "[B]ecause appellees failed to raise this procedural defense in the district court, they are the ones who have waived the issue." *Id.* at 109. In this case, the plaintiff not only did not raise the procedural defect caused by the defendants' failure to raise the qualified immunity defense as a grounds for judgment as a matter of law at the conclusion of the evidence, the plaintiff positively asks the Court, somewhat inexplicably, to ignore that

---

ous techniques to avoid the requirement that a motion for a directed verdict be made as a predicate to a motion for judgment notwithstanding the verdict." *Id.* *Id.* at 54 (citations omitted); *see also, Metromedia Co. v. Fugazy,* 983 F.2d 350, 362 (2d Cir.1992) ("Fed.R.Civ.P. 50(b) generally prohibits judgment n.o.v. on any ground not raised in a motion for a directed verdict.") (citations omitted), *cert. denied,* ___ U.S. ___, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Hilord Chemical Corp. v. Ricoh Elecs., Inc.,* 875 F.2d 32, 38–39 (2d Cir. 1989) (holding that although a motion for judgment n.o.v. may in certain circumstances be entertained by a district court even if a prior motion for a directed verdict made at the close of the plaintiff's case was not renewed at the close of all the evidence, "In any event, the motion for j.n.o.v. cannot assert a ground that was not included in the motion for a directed verdict.") (citation and internal quotation marks omitted); *Ebker v. Tan Jay Int'l, Ltd.,* 739 F.2d 812, 823–24 (2d Cir.1984) (same); *Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770, 778 (S.D.N.Y. 1984) ("[D]efendants are precluded on the judgment n.o.v. motion from relying on a ground not raised on the directed verdict motion."), *aff'd,* 768 F.2d 22 (2d Cir.1985), *cert. denied sub nom Simplot v. Strobl,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985).

8. In *Redd,* which was cited with approval in *Cruz,* the Court of Appeals for the Eleventh Circuit reversed the district court's grant of judgment notwithstanding the verdict on the ground that the defendant had moved for a directed verdict only at the close of the plaintiff's case and not at the close of all the evidence. The court held that Rule 50(b)'s requirement of a motion for a directed verdict at the close of all the evidence could not be overlooked: "We are presented with a particularly clear and mechanical rule of law; the [defendant] did not comply and the district judge may not wave his magic wand dismissing a procedural requirement as a technicality. Therefore the district court's JNOV is reversed." *Redd,* 934 F.2d at 1214. *Cf. Ebker v. Tan Jay Int'l, Ltd.,* 739 F.2d 812, 823–24 (2d Cir.1984) (allowing a limited exception to Rule 50(b) when a prior motion for a directed verdict is not renewed at the close of all the evidence).

procedural defect and to reach the merits of the qualified immunity defense as a basis for judgment as a matter of law. The plaintiff asks the Court to deny the motion for judgment as a matter of law on the issue of qualified immunity on the merits.

There is a substantial question whether the Court should even reach the merits of the qualified immunity defense in view of the plain procedural default by the defendants. In any event, however, there is no merit to the belated motion for judgment as a matter of law based on qualified immunity.

## IV.

The defendants would not be entitled to the defense of qualified immunity even if they had complied with the requirements of Rule 50(b). Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). The Court of Appeals for the Second Circuit has established a three part test for determining whether a defendant is entitled to qualified immunity:

(1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); *see also Calhoun v. New York State Div. of Parole Officers,* 999 F.2d 647, 654 (2d Cir.1993); *Jermosen v. Smith,*

945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

In this case, the courts have defined the right in question with "reasonable specificity" and the decisional law of the Supreme Court and the Court of Appeals for the Second Circuit support the right. In *Rankin v. McPherson,* the Court declared that, "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech," citing the 1972 case of *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Rankin,* 483 U.S. at 383, 107 S.Ct. at 2896; *see also, Frank,* 1 F.3d at 1328. *Connick* and *Pickering* were decided in 1983 and 1968 respectively. Although the contours of *Pickering* balancing analysis may not always be clear, that balancing is not an issue in this case, because the defendants have explicitly disclaimed that they are relying on it, and indeed there was no evidence to support any argument of disruption of government functions.

The central question in this case regarding qualified immunity is "whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Frank,* 1 F.3d at 1328.[9] For the reasons already discussed, the Court finds that Rao's complaints to his supervisors regarding the inefficient management of a significant public project and of extortionate threats related to it clearly constitute speech addressing matters of public concern, that the plaintiff could not have been constitutionally terminated for that speech, that the existence of that right was well established in 1987 when the plaintiff was terminated, and that any reasonable official would have understood at that time that it was unconstitutional to dismiss an employee for such a reason. *Cf. Piesco v. City of New York Dep't of Personnel,* 933 F.2d 1149 (2d Cir.1991) ("Here, as in *Reuber* and *Dobosz,* we consid-

---

**9.** *See also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (citations omitted).

er Dr. Piesco's statements of such clear public concern that it would not be reasonable for Ortiz and LaPorte to conclude that it was lawful to discharge or otherwise retaliate against Dr. Piesco.") (citing *Reuber v. Food Chemical News, Inc.,* 899 F.2d 271 (4th Cir.), *reh'g granted and decision vacated on other grounds,* 922 F.2d 197 (4th Cir.1990), *and on reh'g,* 925 F.2d 703 (4th Cir.1991); *Dobosz v. Walsh,* 892 F.2d 1135 (2d Cir.1989), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); *Vasbinder,* 926 F.2d 1333 (affirming denial of qualified immunity in First Amendment case); *Rookard,* 710 F.2d 41 (1983) (holding in 1983 that conduct similar to that of defendants violated First Amendment). It would not have been objectively reasonable for the defendants to have believed that they could have discharged the plaintiff because he exercised his right to speak about a matter of significant public concern. That is precisely what the jury found the defendants to have done. There is no qualified immunity for that action.

For the foregoing reasons, the defendants motion for judgment as a matter of law is denied.

**SO ORDERED.**

APPENDIX A

# NEW YORK CITY HEALTH AND HOSPITALS CORPORATION

346 Broadway • New York, New York 10013

TO: Robert W. Weigand
 Senior Director/Deputy Chief Engineer
 Construction

FROM: Ramakrishna C.V. Rao, P.E.
 Director
 Facilities and Engineering Services

SUBJECT: Construction Consultant, Jos L. Muscarelle, Inc.
 Cumberland CNFCC IFA 3240 Contract No. 16-6-023

DATE: December 15, 1986

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please refer to our discussions on December 13, 1986, regarding the failure of our Construction Consultant in providing the Construction Management Services we contracted for, my letters and memoranda seeking your approval for the proposed remedial action, copies attached, and the threats from Jameson of Free At Last. Any further delay in taking appropriate action will seriously prejudice our interests.

The project is behind schedule as such and it will not be completed on time and within the budget. The extent of delay and the budget slip depend solely on the performance of our Construction Consultant which, as of this date, is far from satisfactory. I find that the Construction Consultant:

1) is unable to submit a revised schedule and a write-up we asked for on December 3, 1986 (See, My memoranda dated 12/3/86 and 12/4/86 to you and Sandy Krusch respectively)

2) needs prompting on subcontractor approval (See, My memorandum dated 12/5/86 to Sandy Krusch)

3) fails to follow-up on Contractor's insurance (See, My memorandum dated 12/5/86 to Sandy Krusch)

4) fails to comply with written directive on daily inspection (See, My memorandum dated 12/4/86 to Donald Boerl, My memorandum dated 12/9/86 to you and my draft letter dated 12/9/86 to you and my draft letter dated 12/9/86 to Laurence Skaller)

5) fails to comply with contract requirements on manning the field office (See, My memorandum dated 12/11/86 to you and my draft letter dated 12/11/86 to Laurence Skaller)

6) performs 90% of field work in its New Jersey Office (Sandy Krusch's admission to Wilfred Lawrence and myself on 12/3/86)

1250

7) is unable to prepare the minutes of progress meetings and that Wilfred Lawrence has to spend inordinate amount of time in re-writing them (You have the copies of minutes)

8) fails to comply with written directive on field staffing (See, Wilfred Lawrence's memorandum dated 12/9/86 to Sandy Krusch)

9) fails to submit cash flow charts despite written and verbal reminders from Wilfred Lawrence during the past two (2) months

10) operates only one out of three elevators creating a long wait and Contractor backlog (I walked to 5th floor on 12/11/86 and 12/12/86)

11) needs written directive on issuing bulleting and change order (See, My memorandum dated 12/12/86 to Sandy Kursch)

12) fails to get the required change letter from the Design Consultant, fails to prepare the cost estimate and fails to issue the bulletin (Events of 12/11/86)

13) has no control over the Contractors, fails to monitor contract work and expects us to do its work

14) fails to provide clerical support to our field office such as mail pickup, copying, typing, etc. and refuses to furnish a telephone (we currently use Cumberland's phone).

We are paying the Construction Consultant around $1,000,000 and based on the IFA fee of around $1,000,000 we can support a staff of twelve (12) at $80,000 per individual. If you can give me one (1) Construction Manager, two (2) Superintendents of Construction and (1) PAA, I can bring this project to a satisfactory conclusion without the Construction Consultant.

I am also seeking your help in viewof the threats from Jameson of Free At Last who wants $50,000 per year from us. (See, My memorandum dated 12/5/86 to you.)

Please let me know your decision by December 26, 1986.