Michael F. CAHILL, Jr., Richard
G. Morse, Jr. and Salvatore
F. Valvo, Plaintiffs,

v.

James O'DONNELL, individually, James W. McCormack, individually, Nancy Poulin, individually, Robert L. Welsh, individually, James A. Fitzgerald, individually, James McMahon, individually, and Glenn Valle, individually, Defendants.

No. 97 Civ. 4420(BDP).

United States District Court,
S.D. New York.

Dec. 7, 1999.

Jonathan Lovett, Lovett & Gould, White Plains, NY, for plaintiffs.

John B. Harris, Stillman & Friedman, New York City, for defendants McMahon and Fitzgerald.

Paul M. Collins, Hinman Straub Pigors & Manning, Albany, NY, for defendant McCormick.

Gary Silverman, O'Dwyer & Bernstein, New York City, for defendant O'Donnell.

## MEMORANDUM AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiffs Michael Cahill, Richard Morse, Jr. and Salvatore Valvo commenced this action pursuant to 42 U.S.C. § 1983 against defendants James O'Donnell, James McCormack, James McMahon and James Fitzgerald, individually, alleging retaliation as a consequence of their exercising First Amendment rights. Valvo also alleges Fourteenth Amendment due process violations and that he was constructively discharged from his employment. The defendants move for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated below, the motion is granted.[1]

During the events giving rise to this action, the plaintiffs worked in the Internal Affairs Division of the New York State Police ("Internal Affairs"), which is charged with investigating corruption and misconduct within the force. The gravamen of the plaintiffs' claim is that, because of their participation in two investigations, they were stripped of responsibilities, punitively denied transfers and falsely accused of gender discrimination. The relevant facts, construed in the light most favorable to the plaintiffs are as follows.

At the relevant times, James McMahon was the Superintendent and James O'Donnell was a Lieutenant Colonel on the force. James McCormack was a sergeant and served as the President of the Police Benevolent Association of the New York State Troopers, Inc. ("PBA"). Since April 1996, James Fitzgerald has been Chief Inspector in charge of the Internal Affairs Division.

In September 1994, Superintendent McMahon received an anonymous tip that certain troopers assigned to Troop K had attempted to cover-up an incident in Peekskill in which the brother of a trooper had been involved in a hit-and-run accident (the "Peekskill Incident"). Members of Internal Affairs, including Cahill, Valvo and Morse, began investigating, and by December 1994, had identified three members of the State Police likely to have committed misconduct: Sergeant Robert Welsh, Sergeant Thomas Cerrone and Trooper Robert Gregory.

On January 19, 1995, members of Internal Affairs stopped Sergeant Cerrone while he was driving home and directed him to accompany them to a nearby hotel where he was questioned extensively about the case. The details of this stop and his subsequent interview became matters of controversy within the State Police. Shortly after the stop, officers and delegates of the PBA, including its president, McCormack, went to McMahon's office to announce their intention to file a lawsuit against seven members of Internal Affairs, including each of the plaintiffs, for violating Cerrone's constitutional rights in stopping and interrogating him without probable cause.

In February 1995, Cerrone commenced a civil rights action in federal court in the Northern District of New York. The plaintiffs here who were defendants in the Cerrone action, claim they were improperly denied legal representation by the PBA. They were, however, represented,

---

1. Plaintiffs' counsel, in opposition to this summary judgment motion, has filed a 103 page "Plaintiff's Statement Pursuant to Local Rule 56.1," accompanied by 7 volumes containing 77 exhibits, instead of a response to the defendants' local rule 56.1 statements, as required. Local Rule 56.1 states, "the papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Plaintiffs' document is in derogation of the local rule.

pursuant to § 17 of the New York State Public Officers Law, by the Office of the Attorney General. At some point soon after this incident, McMahon spoke to in-service training classes, and allegedly conveyed the impression that members of the Division apparently believed that a grand jury was considering the indictment of Valvo, Morse and Cahill for the stop and interrogation of Cerrone. The plaintiffs believe these misstatements to the classes, whatever they were, were retaliatory ones directed at them because of their participation in the Internal Affairs investigation.

In April 1995, Sergeant Welsh, Trooper Gregory and Rory Knapp were indicted for crimes related to the Peekskill Incident. Welsh pleaded guilty to official misconduct and agreed to resign. Gregory pleaded guilty to administrative charges and was suspended and Knapp pleaded guilty to criminal charges. No criminal charges were filed against Cerrone. McMahon, however, authorized administrative charges against Cerrone for conduct related to the Peekskill Incident and for driving an unregistered vehicle.

The plaintiffs contend McMahon's decision to delay the start of the administrative proceeding against Cerrone adversely affected the criminal prosecutions. Three commissioned officers were designated to serve on the Hearing Board.[2] After hearing 26 witness over a 12 day period, the Hearing Board found Cerrone not guilty of the charges, except those relating to the unregistered vehicle. The Board recommended that Cerrone be censured, placed on probation for 90 days and lose 5 vacation days. McMahon concurred in the recommendations, but declined to impose the loss of vacation days.

In January 1995, local supervisors transferred Senior Investigator Gregory Harlin from the Peekskill to the Fishkill barracks. Valvo contends that he personally advised

McMahon that he believed the transfer to be punitive because of Harlin's cooperation with Internal Affairs regarding its investigation into a suicide. After McMahon was advised that the transfer may have been linked to Harlin's cooperation with Internal Affairs, McMahon requested a review, and subsequently, on February 7, 1995, directed that the transfer be rescinded. Valvo, at the request of Chief Inspector Francis DeFrancesco conducted an inquiry and wrote a memorandum addressing Harlin's transfer. The plaintiffs essentially claim that, although McMahon could have immediately suspended the transfer order, he did not, and instead ordered an investigation. The plaintiffs claim that Harlin's belated reassignment by McMahon was intended as a signal to other members of the force not to cooperate with Internal Affairs.

In February 1997, the PBA issued a newsletter that, *inter alia*, demanded an investigation into whether members of Internal Affairs perjured themselves at the Cerrone hearing. McMahon decided not to initiate such an investigation. McMahon told Valvo, however, after receiving an advance copy of the newsletter, that he should sue the PBA for libel. The PBA had previously published newsletters in 1995 and 1996 which the plaintiffs believed to have been unfairly derogative. Valvo spoke to McMahon and requested, as a sign of support, a response or statement from him regarding the published allegations. Valvo contends that McMahon's failure to conduct an investigation after this complaint had a chilling effect on his investigation and impaired his credibility. Cahill sent a memo to Major William J. DeBlock requesting to meet with the Superintendent regarding the 1997 PBA newsletter and stating that he was in favor of a full investigation into the allegations. Morse also contends he spoke to Fitzgerald about the perceived lack of support for

---

**2.** The plaintiffs claim that one of the hearing officers, Lieutenant Colonel Deborah Campbell, was not properly on the Board because she had a social connection to Welsh and had

sat next to him at a retirement dinner. Morse claims he pointed out this alleged conflict to an unnamed superior, but Campbell was not recused.

Internal Affairs within the force's high echelon leadership.

Before May 1995, Cahill had made known his interest in being transferred back to a field position nearer to his home. When a captain's position opened, Cahill was offered the position and accepted it willingly. The position carried with it a pay loss of approximately $12,000. Cahill is quoted in a May 1996 Times Herald Record article stating, "Yes, it is a pretty good pay cut, and yes, a lot of people think I'm on the crazy side. As you get older, those trips to Albany get longer and longer." Cahill now claims, however, that because McMahon and Fitzgerald refused to support the members of Internal Affairs who had been strongly criticized by the PBA in its publication, he felt he had no choice but to leave Internal Affairs. Cahill claims that his positive statement to the newspaper was an attempt to avoid public embarrassment over his "forced" transfer.

On January 7, 1997, Cahill visited the Highland Station which he supervised. During the course of his visit, Cahill removed materials from the bulletin boards and other locations in the station, and then stacked them on Sergeant Nancy Poulin's desk. Cahill then handwrote a note essentially telling her to clean up the mess. This incident caused Sergeant Poulin to feel "embarrassed and humiliated." She concluded that Cahill's actions were inappropriate and directed to her because of her gender.

On February 11, 1997, Sergeant Poulin received a telephone call from Lieutenant Donald DePass, who was assigned to the department's Equal Employment Opportunity ("EEO") office. In response to questioning, Poulin confirmed the incident. Poulin, after meeting with Cahill, met with Investigator Jimenez of the Division's Human Resources department. Poulin described the incident and others to Jimenez, reiterating her belief that they were discriminatory. After DePass spoke to Poulin, Lieutenant Colonel Deborah Campbell, Director of Human Resources of the New York State Police, assigned Captain Jeff Culkin, who was an EEO counselor to mediate the issue. When Culkin informed Cahill that the Division EEO had received a complaint of gender discrimination from Poulin and that the matter would be handled through the informal procedures, Cahill stated that he would not participate in an informal procedure and demanded a formal investigation. As a result, Lieutenant Colonel James O'Donnell was assigned to conduct the formal investigation. On March 19, 1997, O'Donnell received the assignment from Chief Inspector Fitzgerald and fulfilled it.

The investigation report comprised 49 pages and concluded that the investigation failed to substantiate the allegations that Poulin was treated inappropriately by Cahill because of her gender. Cahill claims that the gender discrimination charges were proffered against him because of his activities in Internal Affairs. He also claims he found out that the charges were determined to be unfounded many weeks after Poulin.

On May 18, 1997, there was a confrontation at the Onondaga Nation Reservation between members of the State Police and demonstrators protesting tax matters affecting the Reservation. Violence ensued and a number of protesters and troopers sustained injuries. Superintendent McMahon directed Internal Affairs investigate the incident. Fitzgerald placed Valvo in charge of the investigation. During a briefing on May 21, 1997, Fitzgerald emphasized that he was interested in avoiding an adversarial relationship with the troopers allegedly involved, but nonetheless wanted a full review of the facts. On May 22, 1997, O'Donnell received a phone call informing him that Valvo had been interrogating a participant for over 3 ½ hours and that the interrogation was continuing. Concerned that the interrogation was not being conducted in the manner directed by Fitzgerald, O'Donnell informed Fitzgerald of the information he had received. On May 27, Fitzgerald removed Valvo as head of the investigation. Valvo claims he was

not told that a cooperative atmosphere was sought and that his removal was in retaliation for his investigation of the 1994 Peekskill Incident.

In mid-June 1997, Valvo, Cahill and Morse filed this lawsuit against their supervisors alleging conspiracy and retaliation because of their conduct in the Peekskill investigation. During the pendency of the lawsuit, Valvo was continuing to work at Internal Affairs under the supervision of the individuals he was suing and whose integrity he had publically questioned in the litigation. After complaints from Fitzgerald that Valvo's presence was compromising Internal Affairs, McMahon requested advice from counsel as to whether he could reassign Valvo. He was advised he could do so legally, so effective July 1, 1997, McMahon reassigned Valvo to a newly created position of Staff Inspector Central Records Administration. This position entailed the same salary and benefits. On the first day of his reassignment Valvo wrote McMahon stating that he was retiring effective September 11, 1997. Valvo believed this new position was a demotion and that he was subjected to unsuitable office conditions. This transfer forms the basis of Valvo's retaliation claim as well as his claim of constructive discharge.

Morse claims he was not provided job performance evaluations and was thus precluded from seeking promotion to the position of lieutenant. He also claims that after his testimony in 1998, he suffered a punitive transfer. Morse has adduced no admissible evidence detailing how this new position was inferior.

In a supplemental affidavit requested by this Court, the plaintiffs were asked to detail their allegedly protected speech. This affidavit, although unwieldy, seems to claim the following as protected speech: (1) statements made by Valvo, Morse and Cahill to Cerrone during the disputed stop and interrogation, (2) Valvo's request that Harlin meet with him regarding the investigation into the death by State Police of a man named "Signet", (3) questions asked by Valvo during his interrogation of a Ma-

jor Parmley and a Captain Beach during his investigation of the Onondaga incident, (4) Valvo's statement to McMahon that Harlin's transfer was retaliatory, (5) Valvo's operational plan that he prepared before starting his investigation of the Onondaga incident, (6) Cahill's discussion with two other members of the State Police that McMahon could have been involved with the Cerrone lawsuit, (7) Cahill's statement to McMahon regarding Harlin's transfer, (8) Cahill telling McMahon of possible subjects who could be interviewed regarding the Peekskill Incident and his decision to interview Cerrone, (9) Cahill's memo to the Chief Inspector detailing findings regarding Ketcham's meeting with various officers, (10) Cahill's statement to McMahon that his subordinates were questioning his conduct because of McMahon's lack of support, (11) Cahill and Valvo speaking to McMahon about his lack of support for the inspection unit and the "message" it sent, (12) Cahill and Valvo telling McMahon the circumstances of Major Ketcham's meeting with targets of the Peekskill Incident which they believed to be improper, (13) Morse's statements to Fitzgerald regarding the missing rounds of a trooper, (14) Morse's memo to Fitzgerald in 1996 regarding trooper Hamilton who was implicated in the Peekskill Incident, and (15) Morse's memo in 1996 to Fitzgerald regarding a shooting incident involving Trooper Martine.

## DISCUSSION

### 1. Summary Judgment Standard

A motion for summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hayes v. New York City Dep't. of Corrections*, 84 F.3d 614, 619 (2d Cir.1996); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). The court is to perform "the

threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos*, 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Hayes*, 84 F.3d 614 at 619.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities in the light most favorable to, and draw all reasonable inferences in favor of, the party opposing the motion. *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 382 (2d Cir.1996); *In re State Police Litigation*, 88 F.3d 111, 123 (2d Cir.1996). The Court must not weigh evidence or assess the credibility of potential witnesses, for such evaluations are to be conducted solely by the jury. *Hayes*, 84 F.3d at 619; *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994). A finding of disputed material facts that could reasonably be resolved in favor of either party precludes summary judgment. *Wernick*, 91 F.3d at 382.

Generally, the burden is on the moving party to demonstrate that there is no genuine dispute respecting any material fact and that he is entitled to judgment as a matter of law. *In re State Police Litigation*, 88 F.3d at 123; *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). To successfully oppose a motion for summary judgment, the responding party "must set forth facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A summary judgment motion cannot be defeated through mere speculation or conjecture. *Pollis v. New School for Social Research*, 829 F.Supp. 584, 586 (S.D.N.Y. 1993) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (other citations omitted)).

Where the alleged constitutional violation includes a subjective component, as in the case of retaliation claims, the plaintiff, to resist successfully a summary judgment motion, "must offer specific evidence of improper motivation." *Blue v. Koren*, 72 F.3d 1075, 1083 (2d Cir.1995). "If the conduct was objectively reasonable, a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment." *Id.* at 1084. Rather, the plaintiff must "proffer particularized evidence of direct or circumstantial facts ... supporting the claim of improper motive." *Id.* The particularized evidence may include "expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Id.*

### 2. First Amendment Retaliation

■ The defendants move for summary judgment on the plaintiffs' First Amendment retaliation claim. Government employees have a right under the First Amendment to speak on matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). That right, however, is not unlimited, for the government has a legitimate interest in "promoting the efficiency of the public services it performs through its employees." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

■ To establish a *prima facie* case of First Amendment retaliation, a public employee must establish speech that may be fairly characterized as involving matters of public concern, *Connick*, 461 U.S. at 146, 103 S.Ct. 1684, and that the speech was "at least a 'substantial' or 'motivating' factor" in the adverse action taken by the employer. *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, a plaintiff must show that he suffered adverse

employment action and that there is a causal connection between the protected speech and the adverse action. *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994). This causal connection must be sufficient to warrant an inference that the "speech was a substantial motivating factor in the adverse employment action." *Id.* Further, the claimed adverse employment action must relate to a significant aspect of the employment relationship, *Rutan v. Republican Party,* 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), and create "a materially adverse change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997) (internal quotations omitted), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

■ If the employee meets this initial burden, a government employer may nonetheless avoid liability in either of two ways. First, the employer can prevail if it can show that it reasonably believed that the speech would potentially interfere with, or disrupt, the government's activities, and can persuade the court that the potential disruptiveness outweighed the First Amendment value of that speech. *Heil,* 147 F.3d at 109 (citations omitted). Second, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech. *Id.*

■ The question of whether an "employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–148, 103 S.Ct. 1684. Speech will be fairly characterized as a matter of public concern if it relates to any matter of political, social, or other concern to the community. *See Connick,* 461 U.S. at 146, 103 S.Ct. 1684. A public employee's speech on matters of purely personal interest or internal office affairs does not constitute a matter of public concern and is, in contrast, not entitled to constitutional protection. *See Verri v. Nanna,* 972 F.Supp. 773, 785 (S.D.N.Y.

1997) (citations omitted); *see also Connick,* 461 U.S. at 148–149, 103 S.Ct. 1684 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case."). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. *Id.* at 149, 103 S.Ct. 1684. Further, when government employee expression cannot be fairly characterized as a matter of public concern, "government officials should enjoy wide latitude in managing their offices without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. 1684.

■ Not all workplace speech by government employees involves matters of public concern. *Connick,* 461 U.S. at 149, 103 S.Ct. 1684. Speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, cannot support a First Amendment claim. *White Plains Towing Corp.,* 991 F.2d at 1058 (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684). For example, a personal desire for a particular work assignment is not a matter of public concern. *Id.* Nor are complaints about one's treatment in a professional training program a matter of public concern. *Ezekwo,* 940 F.2d at 781. The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community. *Rao v. NYC Health &*

*Hospitals Corp.*, 905 F.Supp. 1236, 1243 (S.D.N.Y.1995). "Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight." *White Plains Towing Corp.*, 991 F.2d at 1059.

The plaintiffs claim that their conduct in the Internal Affairs department—namely their investigation of the Peekskill and the Onondaga Nation incidents—constitute speech on a matter of public concern. The plaintiffs point to various statements and memos made to their superiors and targets during these investigations.

These investigations and the statements made incident to them that are the subject of this lawsuit occurred in the ordinary course of plaintiffs' work as members of Internal Affairs. While this fact does not preclude a determination that their speech implicated matters of social or public significance, the fact that the speech arose during the usual performance of their duties weighs strongly against a characterization of the speech as relating to a matter of public concern. *Rao*, 905 F.Supp. at 1242. "A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern." *Id.*

The plaintiffs' work in the Internal Affairs department is undoubtedly important, and the vigilance and integrity of police officers is, in a general way, a matter of public concern. Plaintiffs' actions, under the circumstances presented here, were encompassed within their day-to-day professional obligations within their department and are not fairly distinguishable from the responsibilities of all personnel within Internal Affairs. In this case, the plaintiffs were not attempting to bring to the public's attention pervasive and systematic cover-up in Internal Affairs. Rather they simply exercised their duties, as Internal Affairs personnel, to investi-

gate allegedly improper occurrences within the State Police, and to report their findings as requested. The speech documented in this lawsuit was not public, but was intramural. *See Mishk v. Destefano*, 5 F.Supp.2d 194, 201–202 (S.D.N.Y.1998).

Further, neither the statements made by the plaintiffs to McMahon and Fitzgerald requesting some showing of support for them in the wake of the PBA sanctioned lawsuit and derogatory PBA newsletters, nor their complaints about McMahon's administrative and discretionary decisions, are matters of public concern. All the admissible evidence adduced by the plaintiffs illustrates that they were not speaking out in an attempt publicly to expose institutional problems or police coverups, but rather complaining to their superiors about their perceived mistreatment by the PBA and the lack of support by the upper level officials. The admissible evidence adduced on this motion establishes that these statements were made because of the plaintiffs' overriding desire to clear their names and maintain their reputations and standing with their colleagues in the face of the attacks by the PBA. *See Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir.1999). Given the content, form and context of their statements to McMahon and Fitzgerald, they were commenting on a personal, internal, departmental disagreements. They were not speaking out on matters of public concern. *See generally Verri v. Nanna*, 972 F.Supp. 773, 775 (S.D.N.Y.1997) (citation omitted). Although generally an employee seeking to publicize actual or potential wrongdoing by a public employee is addressing a matter of public concern, *Rao*, 905 F.Supp. at 1242, and arguably the plaintiffs' comments were motivated by apparent concerns over police wrongdoing, the substance, tenor and purpose of the speech they have adduced was not public speech in any realistic sense but was motivated by private interests or pertained to routine business and normal police duties. Thus, defendants are granted summary

judgment on claim one, the plaintiffs' First Amendment free speech retaliation claim.

■ Because the right to petition the government for the redress of grievances under the First Amendment is "an assurance of a particular freedom of expression ... [that] is 'generally subject to the same constitutional analysis' as the right to free speech," *White Plains Towing Corp.*, 991 F.2d at 1059 (citing *Wayte v. United States,* 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1986)), and a freedom of association claim is subject to the same requirements of a free speech claim, *Gros v. Port Washington Police Dist.,* 932 F.Supp. 63, 66 (E.D.N.Y.1996), the Court has treated the plaintiffs' free speech, right to petition the government and freedom of association claims collectively for the purposes of this motion. Accordingly, the plaintiffs' right to petition and freedom of association claims are similarly deficient for the reasons outlined for their free speech claim. The defendants are granted summary judgment on claims two and three.

■ Even assuming *arguendo* that the plaintiffs had established protected speech, they have adduced no admissible evidence tending to show that they suffered adverse employment action, as defined by the case law. Moreover, assuming adverse employment action, plaintiffs have failed to adduce sufficient facts tending to show any causal connection between their speech and the adverse action complained of. A party opposing summary judgment cannot rely on mere conclusory allegations, but must produce "some affirmative indication that his version of relevant events is not fanciful," *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 100 (2d Cir.1997), and this the plaintiffs have failed to do. I will address the claims of each plaintiff separately.

Cahill has not shown that his transfer in May 1995 to a captain's position resulting in a $12,000 pay loss was anything but his own decision. He had requested to return to the field even before the Cerrone inci-

dent. Further, McMahon asked him on several occasions to reconsider his request for a transfer out of concern for a misconception that the transfer was a reaction to the Cerrone lawsuit. Cahill's decision to move departments, even if based on his subjective feeling that McMahon was not providing the necessary support, has not been shown to have been caused by McMahon's retaliatory animus because no adequate evidence tending to show animus has been proffered.

Cahill also claims that Poulin's charge of gender discrimination in 1997 and its investigation was an adverse employment action. To support this contention, however, he must show that his version of the facts is not fanciful. *See Id.* Cahill has adduced no sufficient evidence tending to show that Poulin was improperly required or coerced to proffer the charges against him. Further, following the formal investigation insisted upon by Cahill, the charges were held to be unfounded and resulted in no disciplinary action or other job consequences.

Lastly, Cahill contends that he was not transferred from a captain's position in zone 3 to an identical position in zone 2 in 1997. Because a lateral transfer between the zones would result in no difference in rank, pay, benefits or duties, it cannot be said that the failure to receive a lateral transfer is an adverse employment consequence, especially where, as here, the person chosen for the transfer had worked in the zone before and knew community leaders. Furthermore, departmental reorganizations are part of the day to day administration of local government and, on these facts, do not rise to the level of a constitutional deprivation or an adverse employment action. *See Pavonne v. Lindau,* 96 Civ 4993(CLB), (S.D.N.Y. Dec. 17, 1997).

Valvo contends that he was kept out of the "information loop" and punitively assigned work unworthy of his position. Valvo acknowledges, however, that other investigators, besides those involved in the Peekskill investigation, were not privy to

all information in the unit. In any event, this type of a complaint does not constitute an adverse employment action relating to a significant aspect of an employment relationship.

Valvo also contends that he was given assignments that were beneath his seniority in the unit, such as overseeing copying of a report and performing a urine test. Valvo states, however, that it was not unheard of for inspectors of his status to have such assignments. In any event, these complaints to not rise to the level of adverse employment action and, furthermore, he has failed to adduce any evidence tending to show a causal connection between these assignments and protected speech.

Finally, Valvo contends that, as retaliation, he was replaced as head of the Onondaga investigation. The admissible evidence demonstrates that he was replaced due to the conflict between his investigatory style and the objectives of the investigation imposed by his superior. In any event, this decision was part of the day-to-day administration of a department, and on these facts, does not constitute adverse employment action. *See Pavone, supra.*

Although Valvo's speech involving the various investigations and his requests to McMahon for support do not constitute speech on a matter of public concern, he was transferred after he filed a lawsuit against the State Police. Valvo claims that this transfer is evidence of retaliation. The defendants, on the other hand, claim this transfer was justified under the *Pickering* balancing test.

 As stated previously, the First Amendment rights of public employees are not absolute, as the government has a countervailing interest in efficiently managing its affairs. *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995). The Supreme Court stated in *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a balance must be struck "between the interests of the [employee], as a citizen, in commenting upon matters of public con-

cern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Thus, the ultimate question when a public employee alleges unlawful retaliation for exercising his First Amendment rights is "whether the employee's right to speak is outweighed by the public employer's interest in the effective operation of the workplace." *McEvoy v. Spencer,* 124 F.3d 92, 98 (2d Cir.1997).

When performing the *Pickering* balancing test, courts must assess the extent of the disruption caused by the employee's speech on (1) workplace discipline; (2) harmony among co-workers; (3) working relationships; and (4) the employee's job performance. *Id.* Courts should also assess the responsibilities of the employee within the agency, as "[c]ommon sense tells us that the expressive activities of a highly placed supervisory, confidential, policymaking, or advisory employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion." *Id.* at 103. Our Circuit has held that in the law enforcement context an individual may be considered a confidential employee if he has access to confidential information and if his job responsibilities require him to use confidential information. *Danahy v. Buscaglia,* 134 F.3d 1185, 1191–1192 (2d Cir.1998).

Once the court has assessed the volume of disruption, the court must determine whether the disruption justifies the abridgement of what might otherwise constitute the employee's First Amendment rights. *McEvoy,* 124 F.3d at 98. "Indeed, where the employee holds an extremely confidential or highly placed advisory position, it would be unlikely if the Pickering balance were to be struck in his favor." *Id.* at 103. Furthermore, "regardless of the content of the speech, the responsibilities of the employee, or the context in which the speech was made, an employer is never required 'to allow events to unfold to the extent that the disruption of the

office and the destruction of working relationships is manifest before taking actions.'" *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999) (quoting *Connick,* 461 U.S. at 152, 103 S.Ct. 1684).

Shortly after Valvo filed this lawsuit, Fitzgerald told McMahon that Valvo's presence in Internal Affairs was having a demoralizing effect on the unit and compromising its work. Fitzgerald was particularly concerned that Valvo would no longer follow his direction and that his presence would adversely affect the discipline of other officers. Valvo was the most senior staff inspector and worked closely with State Police counsel and prosecutors on highly sensitive matters. Further, Staff Inspector was a "management confidential" position.

Once McMahon became aware of Fitzgerald's concerns about Valvo's presence in Internal Affairs he consulted with legal counsel, who advised him that, under *Pickering,* he could reassign Valvo. Consequently, Valvo was reassigned to the newly created position of Staff Inspector Central Records Administration, a position that entailed no reduction in salary, benefits or rank. The central responsibility of the position was to oversee the state-wide pistol permit registry. Valvo considered this reassignment degrading and instead of taking it chose to resign.

Considering the legal standards outlined above, McMahon's decision to transfer Valvo was, under *Pickering,* a reasonable response to threatened disruption in the unit. Thus, the defendants are granted summary judgment on claims four, five and six. In any event, McMahon is entitled to qualified immunity because, as discussed more fully *infra,* his belief that Valvo was a confidential employee and could be transferred in accordance with the law was objectively reasonable. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *See Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir.1996); *Anderson v. Creighton,* 483 U.S. 635, 638–639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, it was objec-

tively reasonable for McMahon to believe that the transfer of Valvo would not violate any constitutionally protected right.

Morse contends that he was precluded from seeking a promotion to lieutenant by reason of Fitzgerald's refusal to provide him with job performance evaluations. The factual record, however, is clear that Morse voluntarily decided not to take the lieutenant's test. Such a decision does not constitute adverse employment action. Morse also seems to contend that, after his October 1998 testimony, he was stripped of a prestigious position he had received in 1996. Morse has adduced no admissible evidence detailing how this new position is inferior or tending to show a causal connection between protected speech in 1995 and 1996 and a transfer in 1998.

Notwithstanding the absence of speech on a public concern, or any adverse employment action, the defendants would nonetheless be entitled to qualified immunity. Qualified immunity entitles public officers to be shielded from liability unless their conduct violates clearly established constitutional rights of which a reasonable person would have known, or unless it was objectively unreasonable for them to believe that their acts did not violate those rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *See Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir.1996); *Anderson v. Creighton,* 483 U.S. 635, 638–639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The right alleged to have been violated must be clearly established at a level of specificity such that "a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. To be deprived of qualified immunity, the violation must be sufficiently clear that no reasonable public official could have believed that his actions did not violate the law. *Id.*

Thus, the doctrine of qualified immunity "shields government officials from liability for damages on account of

their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In determining whether a particular legal principle was "clearly established" for purposes of qualified immunity, our Circuit has considered three factors: whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful. *Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999) (internal quotations omitted).

With respect to each defendant, qualified immunity is to be evaluated, of course, solely on the basis of that defendant's conduct. First, however, the Court must decide whether the plaintiffs have alleged a deprivation of a constitutional right. *Id.* at 110. It was, of course, clearly established in 1995 that a public employee is not required to relinquish their First Amendment rights in order to obtain employment in a public agency. *See Connick,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708. The plaintiffs specifically allege that "they had a constitutionally protected right to express opposition to corruption in the Division of State Police without being subject to either actionable adverse employment action or being forced by threats and objectively provable adverse actions into silence."

■ The plaintiffs, however, have adduced no evidence such that a reasonable juror could conclude that any of the defendants were involved in a conspiracy or that the plaintiffs were retaliated against for protected speech, save for McMahon's transfer of Valvo discussed above. "Where there is a total absence of retaliation, there is no basis on which to conclude that the defendant seeking qualified immunity violated clearly established law." *McCullough v. Wyandanch Union Free School District,* 187 F.3d 272, 280 (2d Cir. 1999).

■ McMahon is entitled to qualified immunity on the plaintiffs' complaints concerning his lack of verbal support in the face of PBA complaints and his administrative decisions. A public employee has no clearly established constitutional right to public support by his supervisor in the wake of complaints and verbal attacks by others. Further, it was objectively reasonable for McMahon to believe that his decisions on how to react to the PBA's accusations and how to pursue the charges against Cerrone did not violate clearly established constitutional rights.

■ The plaintiffs have adduced no admissible facts tending to show that Fitzgerald or O'Donnell retaliated against them because of protected speech. Fitzgerald's decision to remove Valvo from the Onondaga investigation is protected by qualified immunity since there is no clearly established constitutional right to head an investigation in the face of a superior officer's decision that the conduct of the investigation was inconsistent with its objectives. Further, there is no clearly established constitutional right preventing a superior from directing that an investigation be conducted in a particular—e.g. non-adversarial—manner. With respect to O'Donnell, it was objectively reasonable for him to believe that he did not violate Cahill's constitutional rights by performing the investigation into gender discrimination charges at the request of his superior or by reporting to Fitzgerald Valvo's conduct during the Onondaga investigation.

### 3. Constructive Discharge

Valvo alleges that he was constructively discharged from the police department. He asserts that his re-assignment "was the consummate public humiliation and embarrassment," which made working conditions

for him "so intolerable that he reluctantly was constrained to retire."

A constructive discharge occurs when the employer, rather than directly terminating the employee, " 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (quoting *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). The standard is not easily met. A plaintiff is not entitled to a remedy by simply showing that his working conditions were difficult or unpleasant. *See Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993). The evidence must establish that the "employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Id.* (quoting *Pena,* 702 F.2d at 325) (internal quotations omitted).

Here, a reasonable person in Valvo's position would not have felt compelled to resign. Further, he has adduced no sufficient triable facts upon which a reasonable juror could find that the defendants deliberately created intolerable working conditions in order to force his resignation. Accordingly, the defendants' motion for summary judgment on this claim is granted.

Further, the defendants are granted summary judgment on Valvo's 14th amendment due process allegation, claim seven, premised on his transfer because there is no property right to a particular assignment in the State Police, especially where, as here, no loss of rank or pay is involved. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Oladeinde v. City of Birmingham,* 963 F.2d 1481, 1486 (11th Cir.1992).

### 4. Under Color of Law

McCormack claims he is entitled to summary judgment because he was not acting under color of law as the president of the PBA. To recover under 42 U.S.C. § 1983, a plaintiff must prove that the conduct complained of was committed by a person "under color of state law" and deprived the plaintiff of a right under the Constitution or a federal statute. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). " 'Misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law is action taken 'under color of' state law.' " *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law. *See Polk County v. Dodson,* 454 U.S. 312, 319–20, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

The acts complained of by the plaintiffs and attributed to McCormack, namely (1) inflammatory letters in the PBA newsletter, (2) denial of counsel in Cerrone litigation, and (3) invoking of the unionized members of the State Police's right to representation during the Onondaga investigation, were undertaken by McCormack in his capacity as president of the PBA. He did not hold his position as president by virtue of action by the state and he performed functions for the union, not for the government. *See Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996) (holding president of firefighter union was not acting under color of law when undertaking activities in his union capacity). Thus, McCormack is entitled to summary judgment on the plaintiffs' § 1983 claim.

### 5. Leave to amend

Plaintiffs' counsel, in his brief in opposition to summary judgment, seeks leave to file a second amended complaint alleging that the defendants "chilled" the plaintiffs' exercise of their First Amendment rights. This is not a proper application for leave. Notwithstanding this serious procedural flaw, leave to amend should

be freely given unless undue delay, bad faith or dilatory motive on the part of the movant or undue prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Plaintiffs' counsel has proffered no reason for his long delay in seeking to amend the complaint. Discovery was completed in December 1998. The summary judgment motions were filed in May 1999. Our Circuit has consistently found prejudice and denied amendments where discovery has already been completed and summary judgment motions have been filed. *See e.g. Ansam Assoc., Inc. v. Cola Petroleum Ltd.*, 760 F.2d 442 (2d Cir.1985). Accordingly, this motion is denied due to undue delay and prejudice.

## CONCLUSION

For the reasons stated above, all defendants are granted summary judgment on plaintiffs' First Amendment retaliation claims. McMahon, Fitzgerald and O'Donnell are entitled to qualified immunity. McCormack is entitled to summary judgment because he was not acting under color of law. Plaintiffs' leave to amend is denied. The Clerk of the Court is directed to enter judgment for the defendants and to close the case.